# CHARLESTON.

HURLEY & SON *v.* NORFOLK & WESTERN RY. CO.

Submitted January 18, 1910.    Decided December 20, 1910.

1.  CARRIERS—*Liability—Receipt of Goods—Warehouseman.*

If, after a common carrier has transported goods to the place to which it agreed to carry them, the consignee pays the freight on them, receipts for them, makes a contract for reshipment thereof with another carrier, and leaves them in the warehouse or freight room of such first carrier, to wait reshipment, duty and liability as carrier under the first contract are thereby changed to those of warehouseman.

2.  TRIAL—*Instructions—Issues.*

Such a state of facts being admitted on the trial of an action to recover for loss of goods by fire, while so stored, it is error to submit to the jury the question of liability as carrier.

3.  CARRIERS—*Receipt of Goods—Delay in Removal.*

It is proper to refuse to instruct the jury, in an action by a consignee against a carrier for loss of goods by fire at the place of delivery, that it was the duty of the consignee to remove them without delay, for the law allows a reasonable time for removal thereof.

4.  SAME—*Contract of Carriage—Termination.*

It is proper, in such case, to refuse to instruct that payment of the freight alone terminates the contract of carriage.

Error to Circuit Court, Mingo County.

Action by Eli Hurley & Son against the Norfolk & Western Railway Company.  Judgment for plaintiff, and defendant brings error.

*Reversed and Remanded.*

*Williams, Scott & Lovett,* for plaintiff in error.

*John S. Marcum,* for defendant in error.

POFFENBARGER, JUDGE:

The defendant complains of a judgment for the sum of $275.37, rendered upon the verdict of a jury in an appeal from the judgment of a justice of the peace, in a civil action to recover the value of merchandise, destroyed by fire in the burning

of its station and warehouse at the village of Devon, on the theory of liability therefor as a carrier of goods, on the one hand, and negligence as warehousemen, on the other.

The property destroyed consisted of clothing, delivered to the defendant at Cincinnati, Ohio, on the 5th day of October, 1906, for shipment to Devon, where it arrived on the 9th day of that month, according to memoranda and the testimony of the agent. The ultimate destination was Argo, in the state of Kentucky, but there was no contract of carriage to that point by the defendant. On the 13th day of the month, a member of the firm of Hurley & Son, plaintiffs, came to Devon, paid the freight, gave a receipt for the goods, and then went to the station or office of the Big Sandy & Cumberland Railroad, a narrow gauge road, running from Devon, and made a contract with it for carriage of the goods from Devon to Argo. This occurred on Saturday. As the Big Sandy & Cumberland road ran no freight train on that nor the next day, the goods remained in the freight room or warehouse of the defendant. On Monday morning, about 3 o'clock, a fire broke out in a neighboring building, standing close to the station, spread to the latter and burned it together with the goods. These facts are undisputed. Some of the agents or servants of the defendant company, having been notified of the fire, went to the station and removed such of the contents as they could. They succeeded in getting out the office fixtures, ticket case and the express and baggage matter and some of the freight. The place is small, and other buildings and their contents being endangered, many of those present were engaged in efforts to prevent the fire from spreading and save the other buildings and their contents. One man says he offered his assistance to a servant of the defendant, and that he declined it, saying the railroad company had insurance sufficient to cover everything in the station. To extend or continue liability as carrier, the plaintiffs rely upon the testimony of a member of the firm to the effect that he made an inquiry for the goods on the Wednesday, next preceding the date of the fire, according to his recollection and belief, with a view to paying the freight, and was informed that they had not arrived. He says the agent, in response to the inquiry, examined the books and then said they had not arrived. The agent denies recollection of the alleged inquiry.

At the conclusion of the evidence, the defendant asked for several instructions, of which Nos. 1, 2, 6, 7, 8 and 9 were refused and the benefit of the ruling thereon was saved by an exception. Instruction No. 1 amounted to a motion to direct a verdict for the defendant. The propriety of the ruling of the court on this depends upon certain legal principles in the light of which the evidence must be considered. We think the contract of carriage had been completed before the fire. The defendant was under no duty to give notice of the arrival of the goods. It is incumbent upon the shipper to watch for and remove them, within a reasonable time after arrival. His failure to do this changes the character of the possession and responsibility of the defendant from that of carrier to warehouseman. As carrier, a railway company is an insurer. As warehouseman, it is not, and the measure of its duty is reasonable and prudent care and provision for the safety of the property. *Berry* v. *W. Va. &c. Ry. Co.*, 44 W. Va. 533; *Hutchinson* v. *Express Co.*, 63 W. Va. 128. It does not matter that plaintiffs lived some miles from the station or that the removal of the goods was attended with difficulty or inconvenience. The duty rested upon them and these difficulties were not matters for which the defendant was in any sense responsible. *Berry* v. *Railway Co.*, cited. All the evidence, bearing on the question, indicates that the goods arrived some days before the fire. Hurley's alleged call for them on Wednesday is the only circumstance, denying arrival on Tuesday, Oct. 9th. Whether he called in the morning or evening of that day is not stated. They may have arrived on that day, after his inquiry. There was no further inquiry until Saturday. That day their previous arrival was admitted, and they could have been removed. They were left in the station to await reshipment. The defendant maintained a freight room for that purpose as well as for storage. This was mere storage by agreement, ending liability as carrier and establishing the relation of warehouseman and patron or depositor. The goods were there, awaiting fulfillment of the contract of carriage made by the plaintiffs with the Big Sandy & Cumberland Railroad Company. That company was to call for the goods. Until it did so, they were to remain in the defendant's freight room. Plaintiffs had ample time to take them out, but elected to leave them there for safe keeping. They not only had ample time on Saturday to

remove them, but arrival and opportunity to get them at an earlier date are almost conclusively shown. No inquiry was made on Thursday or Friday, conceding one to have been made on Wednesday. Nor will it do to say that the failure of the Big Sandy & Cumberland Railroad Company to run a freight train on Saturday or Sunday before the fire constitutes any excuse. Plaintiffs elected to let the goods remain in the station until it should be able to ship them. These conclusions are fully sustained by the text in Elliott on Railroads, sections 1412 and 1443, founded upon numerous well considered decisions.

Coming now to the question of negligence as warehouseman, we observe that the fire did not originate on the premises of the defendant, and that there is no evidence tending to show it arose from any negligence on the part of its servants or any act of theirs. Hence the only inquiry in this connection is, whether there is sufficient evidence in the conduct of the servants, with reference to the safety of the building or the goods after the fire was discovered, to sustain the verdict. The substance of it has been stated. Nothing in it indicates that it was possible to prevent the burning of the defendant's building in which the goods were. The neighboring building in which the fire occurred stood close to it. While no effort was made to keep the fire from it, there is nothing to indicate that such an effort would have availed anything. One witness says the fire started between a store room and a saloon, which stood only four feet apart. If so, the store and a boarding house, both frame, stood between it and the station; but another witness says it started in the boarding house, the building next to the station, and only a few feet from it, a witness says only six or eight feet from the platform. In any view of the evidence, these burned buildings, all nearly connected and readily combustible, came right close to the station. Only one of the defendant's servants, the night operator, was at the station, when the fire occurred. What he did, before the others arrived, is not disclosed. At the date of the trial, he was absent and his location unknown. The other two, rooming some distance away, responded to the alarm promptly. Of course the fire had then made some progress. The station took fire within a half or three quarters of an hour. These two servants, deeming it impossible to save the building, gave their attention and efforts to its con-

tents.  Both say this.  Others· say they made no effort to save the building, but do not say it could have been saved, nor state facts from which the jury could infer it.  There was a well near by and a river close, but nobody says the fire could have been kept out of the building by the use of these means.  All admit rapid progress of the fire and shortness of time.  How long it had been in progress before the arrival of the two agents does not appear.  They thought an effort to save the building, as a measure of protection to its contents, in which alone the plaintiffs had an interest, would be futile, and nobody says it would have availed.  Instead of attempting it, they removed such of the contents as they could.  Three witnesses, Coleman, Preece and Charles, say they did not see these men doing much, but all three were fighting fire and saving goods at other buildings. Preece tried to save his store, rendered assistance to others and then went to the station and found its exterior on fire.  Coleman says he had no opportunity to see just what the agents did, but did see them carrying some things out.  Charles ·says he was busy.  In passing the station several times, he observed closed doors of the freight room, but admits the express office, which was in the freight room was open.  The closed doors he speaks of were only the outer doors, not the one opening into another room, through which express and baggage matter and freight was carried out.  He admits he saw the agents there, does not deny their having taken things out, says only he did not see them do so, and finally admits he saw them carrying a book or two out of the express office.  In passing the station, he was carrying water to the boarding house.  His testimony is not inconsistent with probability of the truth of all the agents say. The two who testified say all three worked diligently and removed office supplies and fixtures, express and baggage matter and freight, and continued their efforts until the fire drove them out.  Nobody in a condition to know the contrary asserts it.  No assistance from bystanders was asked, but nobody, except Charles, says such assistance was available.  The agents say everybody was busy.  Charles says the absent agent declined his offered services.  Taking this as true, he does not say it would have saved all the freight or goods of the plaintiffs, if accepted.

We may say there is some evidence of negligence in all this,

but, to justify·refusal of the peremptory instruction, it must be sufficient to sustain a verdict. A request for such an instruction challenges the sufficiency of the evidence, and should be granted, when the state of the evidence is such as to make it the duty of the court to set aside a verdict founded upon it. Stronger evidence is required to sustain a verdict or preclude such an instruction than to justify an instruction, on the evidence, that leaves the case in the hands of the jury. *State* v. *Clifford,* 59 W. Va. 1. Our analysis of the evidence convinces us that, under this rule, the peremptory instruction should have been given, and, of course, this conclusion necessitates reversal. Unable to see that a better case cannot be made, we grant a new trial also.

There was no error in refusing. defendant's instruction No. 2, reciting salient facts, pertaining to liability as carrier, and leaving the question of liability as warehouseman for negligence to the jury. All of this was substantially covered by its instructions Nos. 3 and 4, which were given. Its instruction No. 6, intended to apprise the jury that the defendant was under no duty to select and save the goods of the plaintiffs in preference to others, was proper and should have been given. They had no right of preference. Its instruction No. 7, saying it was not incumbent upon the defendant to keep a night watchman at the station, was properly refused, its failure to do so not having been proved as a ground of liability. Its instruction No. 8, attempting to impose upon the plaintiffs duty to remove their goods "without delay", was properly refused. The law allowed them a reasonable time for that purpose There was no error in the refusal of its instruction No. 9, saying payment of freight alone terminates liability as carrier, since it would exclude reasonable time for removal, allowed by law.

As the state of the evidence left no room for the jury function on the question of liability of the defendant as carrier, plaintiffs' instruction No. 1, leaving it to the jury to say whether, under all the circumstances of the case, the relation of shipper and carrier had ceased, should have been refused. The goods had been receipted for and a contract of re-shipment made with another road. These facts are undisputed. Hence the question was one of law for the court. There was no error, however, in the giving of plaintiffs' instruction No. 2, submitting to the jury the question of the defendant's negligence as warehouse-

man, there being evidence tending slightly to prove it. The objection was likely based on the theory of total lack of such evidence.

For the reasons stated, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and Remanded.*

Brannon, Judge, *(concurring)*:

I would enter final judgment in this Court for defendant, and not grant a new trial, as I stood in *Weeks* v. *C. & O. R. Co.*, this term. *Maupin* v. *Insurance Co.*, 53 W. Va. 555; *Ketterman* v. *Railroad Co.*, 48 *Id.* 606; *Cobb* v. *Glenn*, 57 *Id.* 49; *Anderson* v. *Tug River*, 39 *Id.* 301. If the court had directed a verdict for defendant as asked, and we hold it should have done so, there would have been judgment below for defendant, and this Court should do what that court should have done. Remember that it is not simply the case of a motion below to set aside the verdict and grant a new trial, but the case of a motion or instruction to find a verdict for defendant, which is the same as a demurrer to evidence. There is always a judgment for the demurrant in the court of appeals when the demurrer is sustained.