# CHARLESTON

BALTIMORE & OHIO RAILROAD CO. *v.* LUELLA COAL CO.

Submitted March 10, 1914. Decided May 5, 1914.

1. CARRIERS—*Shipment of Coal—Refusal to Accept—Liability of Consignor.*

   In the absence of special contract, a shipper of coal in carload lots to a consignee who declines to receive it, is liable to the carrier for the freight and also for demurrage accruing after he has notice of the consignee's refusal. (p. 291).

2. SAME—*Demurrage—Lien on Shipment.*

   The carrier has a lien upon such shipment for both freight and

demurrage accruing after notice to the consignor of the consignee's refusal to accept it.   (p. 293).

3.   SAME—*Shipment—Right to Demurrage.*
    It is the duty of the carrier to notify the consignor of the consignee's refusal to accept a consignment in carload lots, where the carrier is not under duty to unload.  Until such notice is given the consignor is not liable for demurrage.   (p. 294).

Error to Circuit Court, Barbour County.

Action by the Baltimore & Ohio Railroad Company against the Luella Coal & Coke Company.  Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Warder & Robinson,* for plaintiff in error.

*Arthur S. Dayton,* for defendant in error.

WILLIAMS, JUDGE:

In an action upon an account for freight and demurrage charges, tried by the court in lieu of a jury, on an appeal from a justice of the peace, on an agreed statement of facts, plaintiff recovered a judgment against defendant and Herbert M. Crawford, surety on its appeal bond, for $193.36, and defendant was granted this writ of error.  About June 22, 1909, defendant shipped two carloads of coal from its mine in Barbour county, over plaintiff's road, consigned to Interlake Fuel Company at Sandusky, Ohio.  Defendant tacked a card on each car, marked "Memorandum for Agent," bearing the number of the car, the place of destination and name of consignee, which was its usual method of shipping coal.  There was no other evidence of the contract of shipment.  The cars arrived at Sandusky on the 27th June and the consignee was immediately notified by plaintiff's agent and requested to advise what it wished done with the coal.  Numerous other requests were made, but no directions given, and on August 23rd the consignee notified the plaintiff's agent that it declined to accept the coal on account of its quality, and refused to pay the freight and demurrage charges.  Plaintiff's agent then inquired of the consignee to know who was the shipper, and was erroneously informed

that Johnson Brothers of Bellaire, Ohio, were. On October 14th, plaintiff's agent at Sandusky wired Johnson Brothers and received the following reply: "Will not stand refusal after ninety days. Interlake must receive it." And on the 25th October plaintiff wrote from Baltimore to defendant at Philippi, West Virginia, informing it that Interlake Fuel Company had refused to accept the coal on account of its quality, advised it that its agent had made unavailing efforts to get the consignee to accept it and requested defendant to use its "good offices in having these cars promptly disposed of." Defendant replied disclaiming ownership and declining to have anything to do with the coal. On the 15th December, after reasonable effort to get the best price obtainable, plaintiff sold the coal at seventy-five cents per ton, without notice to defendant, realizing $73.40 for the two carloads. The account sued on contains two items, one for freight, $120.87, and one for demurrage at $2 per day for use of cars from August 15th to Debember 15th, $204, making the total amount claimed, including $19.65 interest, $344.52. Credit was given for the $73.40 realized from the sale of the coal, leaving the balance sued for $271.12. It is admitted that $120.87 is a reasonable freight charge, and also that, if plaintiff is entitled to demurrage, $1 per day for each car is a reasonable charge.

Defendant's liability for the freight charge is not controverted. The shipper is always liable for the freight in the absence of a special contract exonerating him, and the consignee becomes liable also when he accepts the shipment. 2 Hutchinson on Carriers, Secs. 799 and 810. Assuming that the consignee was justified in refusing to accept, for there was no duty on the carrier to test the question of ownership between consignor and consignee, it was not liable to plaintiff for the freight, and not being liable for the freight, it follows that it was not liable for demurrage, unless perhaps it might be liable on account of its unreasonable delay in notifying plaintiff that it would not accept the coal, which is a question not raised. The rule respecting the time when the extraordinary liability of a carrier ceases is not uniform throughout the states of the Union. But according to the rule announced in *Moses* v. *The Railroad*, 32 N. H. 523,

known as the New Hampshire rule, which was adopted by this court in *Berry* v. *Railroad Co.*, 44 W. Va. 538, the liability as carrier ceases, not on the arrival of the goods, but in a reasonable time thereafter, without notice to the consignee, the court holding that no notice to the consignee was necessary to terminate the carrier's liability as carrier. See also 2 Hutchinson on Carriers, Sec. 704. After performance of its duty as carrier, a railroad company is liable only as warehouseman, or bailee for hire. *Hurley & Son* v. *Railway Co.*, 68 W. Va. 471. It has a right to charge for caring for goods as warehouseman or bailee, in addition to its compensation as carrier. 2 Hutchinson on Carriers, Sec. 714; 4 Elliott on Railroads, Sec. 1533. But it is not the custom of carriers by rail to store coal shipped by carload, and they are not provided with warehouses for that purpose. It is the duty of the consignee, in the absence of any stipulation in the contract of affreightment to the contrary, to unload such shipments, and if he should fail to do so within a reasonable time, we perceive no good reason why a railroad company should not be entitled to damages for the detention of its cars, on the same principle that it has a right to charge for storing goods in its warehouse. Demurrage is a term derived from the maritime law, and the reason generally assigned for allowing it to carriers by water is, that they have no warehouses and generally have to hold the goods in their vessels until the consignee receives them, and are thereby deprived of the use of their vessels. But is not a railroad company, carrying in carload lots goods to be unloaded by the consignee or shipper, in the same situation? It is thereby deprived of the use of its cars, and, in justice, is certainly as much entitled to demurrage for their detention as the shipper by water is entitled to exact it on account of the detention of his vessel. The law imposes upon railroad companies the duty of supplying the shipping public with prompt and proper service. They are bound to furnish cars, and if the owner of goods shipped does not perform his duties in unloading within a reasonable time, the public as well as the carrier may be greatly inconvenienced. Railroads are under heavy duties and liabilities as public carriers, and it would be manifestly unjust to deny them the right to make reasonable demurrage charges

for the unreasonable detention of their cars. It does not appear in this case whether plaintiff had adopted and promulgated a rule with respect to demurrage charges, but this is not material, as we found our decision, not upon special contract, or even upon notice of rules adopted by the carrier, but upon the law respecting the mutual rights and duties of carrier and shipper. The decisions of the courts of the various states are not uniform on this subject, and there are many cases which hold that the right of railroad companies to demurrage depends altogether upon special contract. But reason and the weight of modern decisions, we think, are against that view. 2 Hutchinson on Carriers, (3rd ed), Sec. 859, wherein the author says, that if the consignee fails to unload the goods, shipped in carload lots, within a reasonable time "the railroad company will be entitled as a matter of right, or in accordance with its published rules and regulations, to demand a reasonable compensation for the use of the cars, whether they belong to it or to another company." See also the following cases which support the text: *N. & W. Ry. Co.* v. *Adams*, 90 Va. 393, 18 S. E. 673; *Schumacher* v. *Railway Co.*, 207 Ill. 199; *Dixon* v. *Railway Co.*, 110 Ga. 173; *Miller & Co.* v. *Railroad & Banking Co.*, 88 Ga. 563, 18 L. R. A. 323; *Miller* v. *Mansfield*, 112 Mass. 260.

The next question is, has the carrier a lien on the goods carried for demurrage? The decisions are in conflict on this question also, many of the earlier cases holding that he has no lien. But nearly all of these cases also hold that the right to demurrage does not exist in the absence of a contract, which we have already said is against reason and the weight of modern decisions. But having determined that the carrier has a right to charge demurrage, we see no reason why he should be denied a lien. Would it not be inconsistent to allow demurrage and deny a lien on the goods to secure its payment? The relation of a railroad company to the owner of a shipment in carload lots, whose duty it is to unload, is analogous to that of a bailee for hire. The law allows such bailee a lien, and we are of the opinion that, by analogy, it exists in favor of a railroad company independent of special contract with the shipper. The following cases so hold: *Schumacher* v. *Railway Co.*, 207 Ill. 199; *Miller* v. *Mansfield*,

*supra; Kentucky &c. Mfg. Co.* v. *Railway Co.,* (Ky.) 32 S. W.
295; *New Orleans &c. Co.* v. *George & Co.,* 82 Miss. 710, 35
Sou. 193; *Darlington* v. *Railway Co.,* 99 Mo. App. 1, 72 S. W.
122. Mr. Hutchinson, in his work on Carriers, Vol. 2, (3rd
Ed.), Sec. 862, says the weight of modern authority sustains
the view that a lien exists for demurrage for detention of cars
by the consignee whose duty it is to unload, on the same prin-
ciple that it would be entitled to a lien for storage charges
for the use of its warehouse.

The consignee declined to receive the coal. Whether it
was justified in doing so does not appear, nor is that ques-
tion material. Plaintiff had a right to look to the shipper
for the payment of freight and demurrage, accruing after it
was notified of the consignee's refusal to accept the shipment.
When the coal was loaded into plaintiff's cars and consigned
to the Interlake Fuel Company there was an implied guaranty
by the consignor that it would be received by the consignee.
The shipper never ceased to be liable for the freight, and when
the shipment was rejected it became liable also for the demur-
rage, occasioned by its breach of duty in disclaiming owner-
ship and in not advising plaintiff what disposition to make
of the coal, after it was notified on the 25th October that the
consignee had declined to receive it. It then became the
duty of the consignor to relieve the railroad company of fur-
ther detention of its cars. But the decisions of the courts
are likewise in conflict on this question, some courts holding
that no notice to the consignor of the consignee's refusal is
necessary in order to give the carrier right to charge demur-
rage. Mr. Hutchinson, Vol. 2, Sec. 721, asserts the better
rule however to be that it is the duty of the carrier to give
notice to the consignor of the consignee's refusal. Such
requirement imposes no heavy obligation on the carrier, and
is just to the consignor who, in the absence of notice, would
have a right to presume that the goods had been received.
Especially would such presumption be reasonable in this
case, as the shipment was made by the consignor to the
consignee apparently upon the order of a third party—
Johnson Brothers of Bellaire, Ohio. The judgment of the
court seems to include demurrage for delay of the cars

only after the time plaintiff notified it of the consignee's refusal to accept.

Plaintiff sold the coal without notice to the consignor, and without legal proceedings to enforce its lien. This was clearly illegal. Unless authority be expressly given to do so, a bailee has no right to sell, except in certain emergencies, but must seek the aid of a court for the enforcement of his lien. 2 Hutchinson on Carriers, Sec. 785. But it is admitted that plaintiff used reasonable diligence to get the best price obtainable for the coal, no damage to the consignor is shown by the unlawful sale and, therefore, the illegality of the sale is no cause for reversing the judgment. The judgment is affirmed.

*Affirmed.*