# Staunton.

## THE VIRGINIAN RAILWAY COMPANY *v.* STOKE.

September 21, 1922.

1. CARRIERS—*Liability of Consignor for Freight—General Rule.*—The consignor with whom the contract of shipment is made is primarily liable for the payment of the freight charges whether he is the owner of the goods or not. A contract to pay freight is to be implied from the mere fact that the consignor has placed the goods with the carrier for the purpose of being carried to their destination. This liability is discharged only by full payment by the consignor or the consignee. Acceptance by the consignee, although accompanied by an undertaking to pay the charges, does not, it has been said, discharge the consignor from liability to the carrier; the two contracts are held to be independent, and not inconsistent one with the other.

2. CARRIERS—*Liability of Consignee for Freight—Agency—Shipper as Consignee's Agent—Case at Bar.*—In an action by a railroad company for freight and demurrage charges against the consignee of two wagons purchased by him from the War Department, and which he refused to receive because shipped to him by the depot quartermaster in an automobile car completely set up instead of being "knocked down" and shipped at a cheaper rate, the question involved was simply one of agency, and the extent of the powers of the agent. If the depot quartermaster had authority from the consignee to engage an automobile car for the shipment of the wagons, the consignee would be liable for the freight and demurrage. If he did not have such authority, actual or ostensible, then the consignee would not be liable.

3. CARRIERS—*Consignor as Agent of Consignee—Sale F. O. B.*—In a sale of army wagons by the War Department, the contract stated that the wagons were to be sold f. o. b. cars, at the point of storage, and were to be billed freight charges collect.

   *Held:* That in order to carry out the contract of sale, it was necessary for the depot quartermaster, at the place of storage, as the agent of the government and not as the agent of the purchaser, to deliver the wagons f. o. b. at the point of storage.

4. CARRIERS—*Consignor as Agent of Consignee—Limited Agency—Case at Bar.*—Where a consignee of wagons purchased the wagons from the War Department and the wagons were sold f. o. b. cars, point of present storage, and were to be billed freight charges collect, even if

the depot quartermaster at the point of storage was the agent of the purchaser and not of the government in signing the bill of lading, so as to render the consignee liable for freight and demurrage charges, he was an agent of very limited authority, and had no authority to engage an automobile car and make a car load shipment of the wagons completely set up when if "knocked down" they could have been shipped in a much smaller space and at less than half the cost.

5. AGENCY—*Notice of Agent's Authority.*—One who deals with an agent of limited authority is presumed to know the extent of the agent's powers.

6. AGENCY—*Notice of Agent's Authority—Authority in Writing—"Holding Out."*—The powers, however, of even a special agent, in the absence of evidence to the contrary, are usually coextensive with the "holding out" by his principal. But where the special agency is created by a writing of which a third person has notice, he will be charged with knowledge of the limitations upon the agent's powers.

Error to a judgment of the Circuit Court of the city of Roanoke. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Williams, Loyall & Tunstall, W. C. Plunkett,* and *Hall, Wingfield & Apperson,* for the plaintiff in error.

*W. L. Welborn,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This is an action of assumpsit brought by the railway company against Stoke to recover a balance claimed by the plaintiff to be due for freight and demurrage on two wagons. By consent of the parties, the case was heard by the court, upon an agreed statement of the facts, without the intervention of a jury. The trial court entered judgment for the defendant, which judgment we are now asked to review and reverse.

The facts of the case are not controverted. They are stated in the petition for the writ of error, and, after

making a slight correction suggested by the defendant in error, are admitted by the defendant in error to be correctly stated. They are as follows:

On October 7, 1920, the defendant, H. F. Stoke, (hereinafter referred to as the defendant) entered into a written contract with the War Department of the United States Government for the purchase of two army escort wagons, which were then located at Camp Sherman, near Chillicothe, Ohio. By this contract the defendant agreed with the War Department to purchase two wagons, which were then stored at Camp Sherman, Chillicothe, Ohio, at the price of $45.00 each and pay to the government the purchase price therefor. In paragraph two of the said contract it is stated that the wagons were sold F. O. B. cars, at the point of storage, and were to be billed freight charges collect. And in paragraph four of this contract the depot quartermaster was directed and authorized to make delivery of the wagons in accordance with paragraph two above referred to.

The defendant paid the purchase price for said wagons and the said depot quartermaster then placed an order for an empty automobile car to be placed on the side tracks of Camp Sherman, at Chillicothe, Ohio, and loaded the two wagons, completely set up, in this automobile car and directed that the two wagons be shipped to the defendant at Moneta, Virginia. The car was accordingly switched from Camp Sherman to the Norfolk and Western tracks at Chillicothe. The camp quartermaster prepared a bill of lading for the car containing the two wagons, which was signed by the agent of the Norfolk and Western and by the camp quartermaster. It provided that "the owner or consignee shall pay the freight and all other lawful charges accruing on said property, and if required shall pay the same before

delivery." The wagons arrived at Moneta, Virginia, located on the line of the Virginian Railway, on November 10, 1920, and the agent of the Virginian Railway Company immediately notified the defendant of the arrival of the shipment and further notified him that the freight charges amounted to $178.22. On the following day the defendant called at the depot of the plaintiff at Moneta, saw the wagons unloaded by the plaintiff in order to release the automobile car in which they were shipped, and stored on the plaintiff's premises. On the same day he asked for a confirmation of the freight charges. On November 13, 1920, petitioner's agent informed the defendant that the correct amount of the freight charges was $138.02, and thereupon the defendant refused to pay the charges or receive the wagons and the wagons remained stored on the property of the plaintiff from that time until the 7th day of February, 1921. The petitioner made numerous efforts to induce the defendant to pay the freight charges and remove his property, but he continued to refuse until the property was sold according to law in February, 1921. The freight charges on the two wagons according to the tariffs lawfully filed with the Interstate Commerce Commission, and published by the petitioner and its connections, amounted to $154.58, and the storage charges for the time that the shipment was allowed to remain on the petitioner's property at Moneta amounted to $322.39, to which was added war tax on the freight charge and on the storage charges, which made a total amount of freight and storage charges due to the petitioner of $476.97. The wagons sold for $40.00, leaving a balance due the petitioner of $436.97.

Had these wagons been shipped completely "knocked down" they would have taken a much cheaper freight rate and the total freight charges would have been $70.79.

The army quartermaster explained his action in shipping the wagons standing instead of "knocked down" by saying that he received no specific instructions as to whether the wagons should be forwarded assembled instead of "knocked down," and because of the extreme shortage of personnel, and in the interest of expediting the shipment, the wagons were forwarded assembled.

In view of the mistake of the depot quartermaster, the quartermaster supply officer at Chicago recommended that the government reimburse Mr. Stoke to the extent of $54, which the depot quartermaster calculated to be the difference between the freight charges properly assessed on the wagons as they were actually shipped and what the freight charges would have been had the wagons been shipped "knocked down."

[1] The general rule with reference to the primary liability of the consignor for freight, whether he is the owner of the goods or not, taken from 10 Corpus Juris, 445, sec. 699, and supported by a great array of authorities, is not controverted by the plaintiff in error, and is as follows:

"The consignor with whom the contract of shipment is made is primarily liable for the payment of the freight charges whether he is the owner of the goods or not. A contract to pay freight is to be implied from the mere fact that the consignor has placed the goods with the carrier for the purpose of being carried to their destination. This liability is discharged only by full payment by the consignor or the consignee. Acceptance by the consignee, although accompanied by an undertaking to pay the charges, does not, it has been said, discharge the consignor from liability to the carrier; the two contracts are held to be independent, and not inconsistent one with the other."

See also *Wooster* v. *Tarr*, 8 Allen (Mass.) 270, 85 Am.

Dec. 707; *Portland Flouring Mills Co.* v. *British & F. M. Ins. Co.*, 130 Fed. 860, 65 C. C. A. 344; *Balto. & O. R. Co.* v. *Luella Coal Co.*, 74 W. Va. 289, 81 S. E. 1044, 52 L. R. A. (N. S.) 398; *Coal, etc., R. Co.* v. *Buckhannon*, 77 W. Va. 309, 87 S. E. 376, L. R. A. 1917-A, 663; Dobie on Bailments and Carriers, p. 462, and cases cited.

But the plaintiff in error insists that the purchaser is liable for the freight because he ordered the wagons to be sent by freight and at his expense, and hence is both consignor and consignee, relying upon *Union Freight R. Co.* v. *Winkley*, 159 Mass. 133, 34 N. E. 91, 38 Am. St. Rep. 398; *Penn. R. Co.* v. *Descalzi*, 59 Pa. Sup. Ct. 614; *Phil. & Read. R. Co.* v. *Parry*, 66 Pa. Sup. Ct. 49. and other cases.

[2, 3] In the view we take of the case, we do not deem it necessary to examine the many authorities cited by counsel on the question of who is liable for freight under varying circumstances.  The question involved is simply one of agency, and the extent of the powers of the agent.  Did the depot quartermaster have authority from Stoke to engage an automobile car for the shipment of the two wagons?  If he did, Stoke is liable for the freight and demurrage.  If he did not have such authority, actual or ostensible, then Stoke is not liable. The wagons were "sold F. O. B. cars, point of present storage, and are billed freight charges collect."  In order to carry out the contract of sale, it was necessary for the depot quartermaster, as the agent of the government and not as the agent of Stoke, to deliver the wagons F. O. B. at the point of storage.  In *Becker & Co.* v. *Norfolk & W. R. Co.*, 125 Va. 558, 100 S. E. 478, a carload of dried fruit was shipped by Griffin-Skelly Company, from Fresno, Cal., to Roanoke, Va.  "The bill of lading shows that the car was 'consigned to the order of

Griffin-Skelly Company, notify W. L. Becker & Co., Roanoke, Va.' The vendor assigned the bill of lading to the vendee." The bill of lading contained the following provisions, which are similar to those in the case at bar:

(a) "It is further stipulated that the service to be performed hereunder shall be subject to the conditions, whether printed or written, herein contained, and said conditions are hereby agreed to by the shipper and by him accepted for himself and his assigns as just and reasonable."

(b) "The owner or consignee to pay freight charges as per specified rates, upon the goods as they arrive."

It was contended in that case that "in signing the bill of lading, the vendors acted as agents for the vendee." But the court said: "We find no ground whatever to support the contention that the vendor in California was the agent of the vendee in signing the bill of lading. He was acting in his own interest in the performance of his own contract to deliver the goods to the carrier, which he had sold to the vendee, to be transported to Roanoke." The same may be said in the case at bar.

[4-6] But even if it be conceded that the depot quartermaster was the agent of Stoke, he was an agent of very limited authority, and it is said that one who deals with such an agent does so at his own risk, that he is presumed to know the extent of the agent's powers. *Silliman* v. *Fredericksburg, etc., R. Co.*, 27 Gratt. (68 Va.) 119; *Bowles* v. *Rice*, 107 Va. 51, 57 S. E. 575, and cases cited; *Rosendorf* v. *Poling*, 48 W. Va. 621, 37 S. E. 555; *Fruit Dispatch Co.* v. *Ellis*, 75 W. Va. 52, 83 S. E. 187. The powers, however, of even a special agent, in the absence of evidence to the contrary, are usually co-extensive with the "holding out" by his principal. Huffcut on Agency, sec. 7. But where the special

agency is created by a writing of which a third person has notice, he will be charged with knowledge of the limitations upon the agent's powers. In *Stainback* v. *Read*, 11 Gratt. (52 Va.) 281, 286, 62 Am. Dec. 648, it is said to be well settled that "a party dealing with an agent acting under a written authority, must take notice of the extent and limits of that authority. He is regarded as dealing with the power before him; and he must, at his peril, observe that the act done by the agent is legally identical with the act authorized by the power." To the same effect, see *Finch* v. *Causey*, 107 Va. 124, 130, 57 S. E. 562.

The only authority the depot quartermaster had from Stoke was the "letter of acceptance of bid for surplus property," in which it is stated that "all goods on this agreement are sold F. O. B. cars, point of present storage, and are billed freight charges collect." In the agreed statement of facts it is stated that the order for wagons was given by Stoke, "believing that the quartermaster would ship the wagons 'knocked down,' so as to take the lowest rate, *as had been done with similar previous shipments.*" It further appears from said statement of facts agreed that "the quartermaster at Camp Sherman was called upon for an explanation as to why the wagons were shipped standing instead of being knocked down, to which he replied that he received no specific instructions as to whether the wagons should be forwarded assembled or knocked down and because of extreme shortage of personnel and in the interest of expediting shipment same were forwarded assembled.

"Recommendation: In view of the fact that the purchaser has had a penalty imposed upon him by the excess freight in this transaction, it is recommended that he be reimbursed to the extent of $54.00, the difference in freight paid and the amount that should have been

13

paid, and refund said amount from the proceeds of sale."

There was no "holding out" of the depot quartermaster as the agent of Stoke, but if there were it extended no further than to make the shipment in the usual manner "as has been done with similar previous shipments." There was no authority to engage an automobile car and make a carload shipment of what could have been shipped in a much smaller space and at less than half the cost. The government recognized this and authorized the refund of the excess freight, but did so long after the demurrage charges had accrued, and at a time when it could not relieve Stoke. Stoke never, directly or indirectly, authorized the hiring of the automobile car. He did not hire the car himself, nor authorize the depot quartermaster to do it, nor hold him out to the public as having authority to do it. The depot quartermaster was not his agent, but the agent of the government, and if loss has accrued to the railroad company, it has not been occasioned by any act or neglect on the part of Stoke. Upon the whole case, we are of opinion that the judgment of the circuit court should be affirmed.

*Affirmed.*