# CHARLESTON.

The New York Central Railroad Company *v.* West Virginia Eagle Coal Company

(No. 6327)

Submitted May 14, 1929.    Decided May 28, 1929.

*C. T. Lewis, Jr.,* and *Leroy Allebach,* for plaintiff in error.
*Price, Smith & Spilman* and *J. D. Preston,* for defendant in error.

Lively, Judge:

This writ of error involves the right of a railroad company to recover from a shipper demurrage on cars loaded with coal consigned to a point of destination, during an embargo against such shipment to said point.

Plaintiff railroad company owned and operated a railroad which made connection with the C. & O. Ry. Company's tracks at Gauley Bridge in this state. Both are interstate carriers. Defendant coal company operated a coal mine at Boncar, eight or nine miles northwest of Gauley Bridge, its tipple

being constructed over a sidetrack of defendant located at Boncar, which sidetrack connected with plaintiff's track at that place. Plaintiff had no agent there and the coal company upon loading cars on the sidetrack placed the billings in a box on the tipple. The conductor of plaintiff's local or gathering train, upon observing such bills and cars took the bills and hauled out the cars to plaintiff's yards where the trains were made up for final destination. Such was the custom at the time the cars here involved were loaded and taken from the sidetrack by plaintiff's local train. At this time defendant was in a district where there was an allotment of cars to each mine according to its relative capacity, under car distribution rules; and no demurrage was charged while the cars remained on the sidetrack, loaded or empty, but its allotment of cars was correspondingly lessened. On October 30, 1926, defendant loaded nine cars of coal for shipment eastward to Newport News at tidewater over C. & O., and which cars were standing on its sidetrack and had placed its mine billing therefor in the billing box on its tipple. That afternoon the local train took these cars and the billing therefor to its yards at Boomer about two miles north of Boncar. Later, that afternoon the billing having been taken to Dickinson several miles farther north, the agent of plaintiff there immediately informed defendant coal company by 'phone that the cars could not be shipped over C. & O. Ry. to their destination because of an embargo against such shipments then in effect, and asked for disposition of the cars; none was given; and the next day plaintiff's trainmaster went to defendant's mines and asked for disposition of the cars, advising that demurrage would accrue unless some disposition was directed. Defendant failed to make disposition and the cars remained at Boomer until November 17th when they were forwarded to their destinations. It appears that a shipping permit for tidewater became effective November 11th, and the cars could have been forwarded on that day, and plaintiff claims demurrage only until that day; but defendant contends that the coal could have been moved on November 4th under C. & O. permit No. D-1050, which would materially lessen the demurrage claimed, in the event that any demurrage was prop-

erly payable by defendant. However, as the right to recover any demurrage whatever was denied by the lower court, the amount of recovery is not before us on this writ. At the conclusion of plaintiff's evidence the court directed the jury to find for defendant, which was done, and judgment of *nil capiat* entered.

Plaintiff argues that it was the duty of defendant upon being notified that the cars could not be delivered to the C. & O. because of the embargo, to minimize or stop demurrage by reconsignment, unloading, or requesting return of the cars to its mine track where demurrage would not accrue, defendant being subject to daily ratings and allotment of cars for its car supply under the railroad's distribution rules. Defendant contends that plaintiff accepted the shipment as consigned and contracted to haul it to Newport News; that defendant was not liable for demurrage while the cars were on plaintiff's tracks under its contract of shipment; that plaintiff was at fault in moving the cars from defendant's mine in the face of an embargo of which it had notice; and should have avoided demurrage by replacing the cars on the mine track without request. Defendant says it was under no duty to reconsign, unload, or request return inasmuch as the railroad had accepted the shipment and executed the shipping contract.

The bills of lading are dated October 30th (the day the cars were removed from the mine track) but plaintiff's agent did not execute these bills until the cars went forward to destination on November 17th. That is, defendant had made out bills ("mine car billing") as of October 30th, and placed them in the bill box at its tipple, and these bills and the cars were moved on that day by plaintiff's local train, but plaintiff did not sign the mine car bills until November 17th, and when its agent signed on that date, the date of these bills, as made out by defendant, was not charged. When the cars were moved on November 17th to destination, the regular uniform bills of lading were made out and signed by the agent of plaintiff at Dickinson and sent to defendant, copies thereof retained by plaintiff, one of which accompanied the cars. These uniform bills were made out and executed on

November 16th (dated as of October 30th) and the cars went forward the next day. Plaintiff's witness Dixon, agent at Dickinson, testified that the cars were not accepted for shipment until the uniform bills prescribed by the I. C. C. were made out; and further, that on the day he received the mine car billings and each day thereafter, he kept in communication with defendant asking for disposition of the cars then standing on the yards at Boomer.

We find no conflict in the evidence. When plaintiff's trainmaster on October 31st visited defendant's mine and informed defendant that it had billed out the cars against the embargo, and asked for other billings, defendant advised that the coal was being handled by Massey & Mathews Company of Richmond, Va., and the latter would be informed, and new billing furnished by them.

Do the uncontroverted facts warrant a recovery against defendant? Demurrage, as pointed out in *Ry. Co.* v. *Coal Co.*, 74 W. Va. 289, 292, originated in maritime transportation. The carriers by water having no warehouses of their own in which to unload their vessels, upon being deprived of the use of their ships because of some act of the shipper or consignee, were allowed compensation therefor, termed "demurrage". It is now quite firmly established that a shipper impliedly contracts with a common carrier to submit to all reasonable rules for regulation of shipments, and that reasonable rules or regulations providing for demurrage are not only proper as between the parties, but are also of the highest public importance, as by their adoption and strict enforcement only can be secured promptness, uniformity and safety in the railroad traffic business of the country. *Kentucky Wagon Mfg. Co.* v. *Railroad Co.*, 98 Ky. 152, 36 L. R. A. 850. Demurrage is a lawful charge by a common carrier. Plaintiff's demurrage tariff fixed a charge of $2.00 per day on each car for the first five days, and $5.00 per car each succeeding day, and applicable (after free time) to cars held for reconsignment, diversion, or reshipment, or held in transit on order of the consignor, consignee or owner; and applicable also to cars loaded with coal when moved from the mines or mine sidings upon instructions from the owner and held at weighing sta-

tions, classification yards or elsewhere for forwarding directions. There is no controversy over the basis of the amount of demurrage sued for, the propriety or existence of the embargo, or the right to charge and collect demurrage generally; but as above set out defendant claims exemption under its contract of loading, and because plaintiff moved the cars from the mine track under the mine car billing. The demurrage tariff being lawful and reasonable, must apply to all shipments without discrimination. To permit a carrier to move embargoed cars from the mine either inadvertently, or for the purpose of favoring the shipper, and thereby relieve the shipper of demurrage after he had been advised of the embargo, would work a discrimination, either voluntary or involuntary, in favor of the shipper. The shipper would in that manner have the use of the cars and the yard for storage, and ready for immediate shipment when the embargo was lifted, and at the same time be entitled to other cars under railroad distribution rules for other loadings without respect to those standing loaded on the yards. Other shippers similarly situated unless they could have the same privilege, would be at a disadvantage. It is apparent how easy such inadvertence or design could be used to give preference and advantage to some favorite shipper. To permit it to be done would open the door to secret evasions of the Commerce Act. The public interests must not be overlooked in viewing contracts and dealings between shippers and public carriers. It is generally held that a carrier cannot be estopped from enforcing its claim for tariffs. *L. & N. Ry. Co.* v. *Central Iron & Coal Co.*, 44 Sup. Ct. Rep. 441, and many cases there cited by Mr. Justice Brandeis. And when demurrage has accrued, the same principle would apply. See *Turner, etc. Co.* v. *C. M. & St. Paul Ry.*, 271 U. S. 259, 70 L. Ed. 934. Appellee relies upon its uniform bill of lading contract, and asserts that demurrage could not be charged against it after appellant had taken the cars and executed the bill of lading, citing *Wordin* v. *Bermis,* 32 Conn. 268, 85 Am. Dec. 255, and cases of like import. But this bill of lading was not executed by the railroad company until the embargo was lifted although dated as of October 30th, and all that time it had repeatedly

notified the coal company it could not forward the cars against the embargo and was requesting disposition to avoid demurrage. The mine car billing was not the bills of lading. They were not the contracts of shipment. The custom was that when the mine car billing came to Dickinson and the coal was weighed, then the mine car billing (in duplicate) was signed and returned to the shipper. The mine car billings for these mine cars were not signed by the agent at Dickinson, but held there, defendant being notified that the cars could not be forwarded over the C. & O. It is true that the appellant was at fault in moving the cars from defendant's mine track. But it is not perceived wherein defendant was injured, for that action made it possible to receive more cars to ship its product to other consignees. And immediately after the cars were thus moved, the mistake of the conductor was communicated to defendant, and the mine car bills were not executed. These facts would not impel a conclusion of acceptance of the cars for transportation to tidewater over the designated connecting carrier. Dixon, the agent of plaintiff at Dickinson, says these cars were never accepted for shipment until November 16th, when bills of lading were made out. Possibly plaintiff should have hauled the cars back to defendant's sidetrack, but defendant had advised the trainmaster on October 31st, that Massey & Mathews of Richmond, Va., who was handling the coal, would furnish billing, and the agent at Boomer says he was in touch with defendant daily for disposition of the cars, but they could not furnish any disposition. There is no conflict; and on a motion to strike the evidence, or on demurrer to it, the evidence must be considered as true, and considered most benignly in favor of demurree. The case of *Cleveland Cooperage Co.* v. *Director*, 57 I. C. C. Repts. 423, cited by plaintiff, and sought to be distinguished by defendant, is very similar to this case and is very persuasive of a like conclusion here. The opinions of the members of that commission selected from the nation at large for their expert knowledge and experience in questions pertaining to interstate transportation, are entitled to peculiar weight. They become experts in this particular class of litigation. The principle announced in the decision is that

where an embargo is placed by reason of a carrier's disability, demurrage may be properly assessed for a detention which the shipper could avoid or abate. In that case complainant had inquired of the division freight agent of the Erie Railroad at Cleveland, Ohio, if freight could be shipped to Nultey, N. J., and was informed that Nultey was not embargoed. Complainant's plant was served by the Big Four Railroad which connected with the Erie at Cleveland. Thereupon, complainant loaded a car with barrels consigned to Nultey, N. J., on December 15, 1917, which was switched by the Big Four to the line of the Erie two days later, and refused by the latter because of an embargo at Nultey, the billed destination. The Big Four knew of the embargo but accepted the shipment with the destination shown on the switching card which accompanied the car. Upon refusal of the Erie to forward the car over its lines, the Big Four, on December 19th, returned the car to complainant's plant where it stood until February 23rd, following, when the car was unloaded and released. The commission said the Big Four was at fault in accepting and moving the car, and the duty devolved on it to deliver the car to the Erie, or to return it to the point of loading without charge, if requested; or to hold it subject to the shipper's instructions; but on the other hand the shipper, upon being notified that the car could not go to Nultey, was under duty to abate demurrage by unloading or by billing it to an unembargoed point; and held the shipper liable to demurrage for the time the car was detained after the shipper had notice that the car could not go forward, less free time. The same principle controlled the decision in *Hudson Motor Car Co.* v. *Michigan Central Ry. Co.*, in 42 I. C. C. Repts. page 1.

The evidence warrants a verdict for plaintiff, and the Common Pleas Court erred in directing a verdict for defendant; and the circuit court erred in refusing a writ of error and holding that the judgment was plainly right. The judgment of the Common Pleas Court will be reversed, the order of the circuit court annulled, and a new trial awarded.

*Reversed; new trial awarded.*