## ST. LOUIS AND THE KANSAS CITY

# COURTS OF APPEALS

---

AT THE

## MARCH TERM, 1903.

---

*(Continued from Volume 98.)*

EVANS R. DARLINGTON et al., Respondents, v. THE MISSOURI PACIFIC RAILWAY COMPANY, Appellant.

**St. Louis Court of Appeals, December 9, 1902.**

1. **Railroads:** CARRIAGE OF FREIGHT: LICENSE. Where a switch connecting with the side track of a railroad company was put in on private land for the convenience of the tenants of the owner; but also for the profit of the railroad company, and partly at its own expense, the railroad company had a license, coupled with an interest in the switch, and as such licensee had the right to move its engines thereon to set in or take out cars consigned to the tenants.

2. ———: ———: ———. And such license can not be arbitrarily or suddenly revoked.

3. ———: ———: ———. And a tenant who leased part of the land with the switch on it, with full knowledge of the uses made of it by the railroad company, had no power to revoke the license, or to interfere with the company's use of the switch, so long as the license was not abused.

4. ——— : ——— : ———. Action of a railroad company in switching cars containing lumber onto a switch on private land, of which the consignee was tenant, for the purpose of allowing them to be unloaded, did not operate to deprive it of dominion over the cars or over the lumber remaining thereon, and did not preclude it from repossessing itself of the cars and lumber for the purpose of enforcing a lien on the lumber.

5. ——— : ——— : DEMURRAGE: RULE. A railroad company has the right to make a rule requiring its consignees to unload their freight from its cars within a reasonable time, or to pay a reasonable sum per day as a demurrage charge for detention of cars beyond such time.

6. ——— : ——— : LIEN: DEMURRAGE: CONTRACT. A railroad company may have a lien for demurrage charges, even without express stipulations therefor in the contract of shipment.

7. ——— : ——— : ——— : BILL OF LADING: CONVERSION. Where a bill of lading required the consignee to unload the shipment from the company's cars within forty-eight hours, or pay a demurrage charge, but the right of the company to remove the cars and warehouse the shipment was not complete until seventy-two hours had expired, and the company removed a car not fully unloaded after the forty-eight hours had expired but within the seventy-two hour period, it was guilty of conversion.

8. ——— : RULE: SHIPMENT OF FREIGHT. A consignee of freight was not excused from non-compliance with his duty to unload it from the cars within the time stipulated in the bill of lading by reason of the extreme condition of the weather.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

REVERSED AND REMANDED.

STATEMENT.

The petition is as follows:

"The plaintiffs, Evans R. Darlington, James G. Berryhill and Samuel L. Berryhill, state that they are partners, and as such are engaged in the lumber business under the firm name and style of E. R. Darlington & Co.; that the defendant, the Missouri Pacific Railway Company, is a railroad company organized and incorporated and operating a railroad under the laws of the State of Missouri.

"Complaining of said defendants, the said plaintiffs, for first cause of action, aver that heretofore, on or about December 16, 1901, at the city of St. Louis, aforesaid, the said defendant, with force and arms, without leave wrongfully seized, took and carried away certain of the goods and chattels of plaintiffs, and then in the possession and control of plaintiffs, to-wit: 1,600 feet of sixteen-foot white pine lumber of the value of $40; 13,277 feet of white pine boards of the value of $338.56; 561 feet clear fir flooring of the value of $28.05; 28 feet clear fir flooring of the value of $1.19; 4,888 feet clear fir flooring of the value of $195.52; being of a total value of $603.32, and converted the same to its own use, and other wrongs to the plaintiffs then and there did, against the peace of the State of Missouri and to the actual damage of plaintiffs in the sum of $700; that said taking was wrongful, by force, malicious and oppressive.

"Wherefore plaintiffs demand judgment for seven hundred dollars, the actual damage as aforesaid, and also for three thousand dollars as punitive damages, together with costs."

The answer was a general denial.

The evidence is that the Merchants' and Manufacturers' Railroad Warehouse Company, a corporation, is the owner in fee of a strip of ground, about five hundred feet north of Chouteau avenue in the city of St. Louis, and abutting the Missouri Pacific Railroad Company's right of way and running parallel with it for a distance of about two thousand feet. In the summer of 1891 an arrangement was agreed to between the Merchants' and Manufacturers' Railroad Warehouse Company and the Missouri Pacific Railroad Company, whereby the railroad company built a switch track on and along the strip of land where it abuts the railroad right of way and connected it at each end with its own sidetrack. The railroad company bore the ex-

pense of constructing the switch and the Merchants'
and Manufacturers' Railroad Warehouse Company
paid for the rails and other material used in the con-
struction of so much of it as is located on its land.

In February, 1896, the Merchants' and Manufac-
turers' Railroad Warehouse Company leased to the
plaintiffs for a term of six years, one hundred and
eighty feet of the larger strip with the right to use
the entire switch on its premises with other tenants of
the lessor.

Plaintiffs are wholesale and retail dealers in lum-
ber. Their lumber is received in carload lots and they
generally had their cars consigned and billed to the
defendant, who, on their arrival in the city of St. Louis,
would take charge of the cars so consigned and place
them on the switch in plaintiff's yards.

On December 12, 1901, defendant received from
its connections two carloads of dressed lumber for de-
livery to plaintiffs, one from Portland, Oregon, the
other from Chippewa Falls, Wisconsin. On the same
day at about eleven o'clock, a. m., the defendant placed
these cars on the switch in the Darlington company's
yards to be unloaded by plaintiffs. Plaintiffs paid the
freight charges and unloaded a part of the lumber.
About noon on December 16, 1901, defendant's
demurrage clerk, finding the two cars partially un-
loaded, presented plaintiffs a bill for two dollars de-
murrage charges on the cars. Darlington, one of the
plaintiffs, to whom the bill was presented, called up the
chief clerk by telephone, in the office of the railroad
company, with whom he said the plaintiffs usually did
business and held a telephonic conversation with him
about the demurrage charges. His evidence of the con-
versation is, in substance, as follows:

"I told him that the lumber in the cars was our
property; that we had paid for it; that we had paid
their charges, and that we owed them nothing on it,
and that I would not pay these car-service charges

because they were unjust, as we had not time to unload them, owing to the bad weather. Well, we had some talk back and forth. He said that he would have to order the cars out unless I paid the charges. Well, I said, as a compromise, I will do this: I will pay these charges if you will promise to refund them. You have a car-service rule which permits the refunding of car-service charges on account of bad weather; and, I said, we certainly had bad weather; there is no question about that, and if you will just say that you will refund these charges, I will pay the young man the two dollars, and we will let it go; and you can make a refund later and we will unload the cars. He said, 'No, I won't promise that; you will have to pay the two dollars or we will take the cars out.' Well, I told him that he had no right to take the cars out; it was my property; it was in my possession; it was on my property, and he had no right to come in there and take them out without my consent.''

Witness then testified that the next thing he knew relating to the transaction was that about noon one of the switch engines of the Missouri Pacific Railway Company, with a crew consisting of an engineer, fireman and two switchmen, came onto plaintiffs' switch, backed down to the two cars and hauled them off, they containing the lumber described in the petition belonging to plaintiffs, and hauled it away, and that he had not seen the lumber since. The engine came over the Darlington switch and track, and into the Darlington yard. Witness went down and told the switch crew that they must not take the cars, that they had no right to do so, and he did not want them taken, that he wanted to finish unloading them. At first the man in charge of the crew said he was coming in there to pull some cars down below; he would not tell witness whether or not he was going to take the cars with the Darlington lumber; could hardly get any answer from him as to what he was going to do, although witness insisted on knowing.

Witness stood on the track, protesting against the entry or removal of the cars, but the engine kept backing down on him and it got so close to him that that he had to jump or be run over. He jumped. When he got off the track the engine kept on down to where the cars were; coupled on to them, pushed them out and away. All this occurred inside of the Darlington lot, on the plaintiffs' switch, about noon, Monday, December 16, 1901.

It is conceded that defendant and their railroad associates have car-service rules, one of which is, when freight in carload lots is to be unloaded by the owner or consignee he is allowed forty-eight hours, excluding Sundays, in which to unload the car after it is set in place for that purpose; that after the lapse of forty-eight hours from the time the car is placed for unloading, the railroad company charges as démurrage $1 per day per car for each day the car remains unloaded, and that plaintiffs were familiar with the rule.

On the back of the bill of lading for the Chippewa Falls shipment was the following:

"All carload freight shall be subject to a minimum charge for trackage and rental of one dollar per car for each twenty-four hours detention or fractional part thereof after the expiration of forty-eight hours from its arrival at destination, and after the expiration of seventy-two hours this company shall be at liberty to unload and store the freight in a warehouse of its own or unload and deliver to a warehouseman. And the consignor or consignee shall pay the C. M. & S. P. Railway Company the expense of unloading and warehousing same, and for such expense this company shall have a lien upon the freight in addition to its own freight charges and back charges."

This car was consigned to plaintiffs.

On the Portland bill of lading is the following:

"It is expressly understood and agreed that shipments of carload or less than carload freight, requiring

the entire use of a car, will be subject to demurrage, in accordance with the current rules and regulations of the company delivering the said goods at points of destination, in case such car is detained over forty-eight hours in loading or unloading.''

This car was consigned to defendant. Plaintiffs never saw either of these bills until offered in evidence by the defendant.

Plaintiffs offered evidence tending to show that from the Friday morning the cars were placed until Saturday noon it was raining continuously and was so extremely cold that their men could not work and unload the lumber and haul it to their sheds. There was countervailing evidence to the effect that it did not rain and that plaintiffs' men were at work unloading other cars, which had come in before the two in question.

At the close of the evidence the defendant offered an instruction in the nature of a demurrer to the evidence, which the court refused.

Defendant then offered six other instructions in line with the following:

''The court instructs the jury, that if you believe from the evidence, that prior to the arrival of the lumber in controversy, at St. Louis, defendant had adopted a rule, that consignees of carload freight would be allowed forty-eight hours' free time, after setting of the car on the switch for unloading, and for every twenty-four hours thereafter that the car was detained for unloading, a demurrage or storage charge of one dollar per car would be made, and that said rule was known to plaintiffs before the arrival of said lumber at St. Louis, and that defendant placed the cars, containing the lumber in controversy, on the switch track in plaintiffs' yard, in the city of St. Louis, for unloading, and that plaintiffs neglected or refused to unload said lumber before seven a. m. of December 16, 1901, then the defendant had the right to charge plaintiffs one dollar per car, for each and every twenty-four

hours that said cars remained unloaded on the track in plaintiffs' yard, after that time; and if you believe from the evidence, that plaintiffs refused to pay defendant, on demand, any demurrage charges that may have accrued on said cars, as aforesaid, then defendant had the right to remove the cars containing said lumber, from said switch track and refuse to deliver said lumber to plaintiffs until they paid the demurrage charges accrued thereon, as aforesaid, and your verdict will be for defendant,'' all of which were refused.

For the plaintiffs the court gave the following instructions:

"1. The court instructs the jury, that the gist of this action is the unlawful, wrongful and forcible taking and carrying away of the property of the plaintiffs, namely the lumber described in the petition, from the possession of the plaintiffs by the defendant; if therefore the jury find that on or about December 16, 1901, the plaintiffs were the owners and in possession of the lumber described in the petition, and that the defendant railroad company, by its agents and employees, at the city of St. Louis, unlawfully and wrongfully interfered with said plaintiffs' possession by forcibly seizing, taking and carrying away said lumber, without lawful right, and against the will of plaintiffs, then the jury should find the issues for the plaintiffs.

"2. If the jury find from the evidence that the defendant placed the two cars containing the lumber on that portion of the sidetrack or switch which is on plaintiffs' yard or premises, in this city, in position for, and for the purpose of enabling the plaintiffs to unload said lumber from the cars—this constituted a delivery of the lumber in said cars to plaintiffs; and if you further find that prior to, or at the time of such delivery, the plaintiffs had paid defendant the freight and all other charges due on said lumber, up to the time of so placing said cars, then the court instructs you, that defendant had no right or lawful authority, without the leave of

plaintiffs and against their will, to take possession of the cars containing said lumber and haul them away from the premises of plaintiffs, even if charges for 'car service' or 'demurrage' as it is sometimes called had accrued after said delivery, by reason of the detention of the cars with the lumber, longer than forty-eight hours after such delivery, or by reason of the failure of the plaintiffs to complete the unloading of all the lumber from said cars within forty-eight hours after such delivery, and to pay defendants for the 'car service' or 'demurrage' claimed for detention of said cars after said forty-eight hours had expired.

"3. If the jury find the issues for the plaintiffs, the court instructs you that you may assess their damages at such sum, not exceeding $700, as you may find, from the evidence, was the reasonable value of the lumber taken by the defendant from plaintiffs, at this city, on the date it was so taken—and you may also include interest at six per cent per annum from that to this date, on the value of the lumber—but the amount, including interest, must not exceed $700.

"4. If you also find from the evidence that such lumber was taken maliciously, that is wantonly, wrongfully, intentionally and willfully; or if the act was done oppressively, that is, by the exercise of superior force and for the purpose of compelling payment of the demands of defendant and because plaintiffs refused to pay the car-service charges, then you are at liberty to assess, in addition to the actual damage as aforesaid, if any, such amount as in your judgment is a reasonable penalty or punishment for the wrong so done, not however, exceeding $3,000; but you are not authorized to give these punitive damages unless you find, from the evidence, not only that defendant took the lumber, but that in taking it, it acted maliciously, that is, wantonly, intentionally, wrongfully, and willfully; or that it acted oppressively as above defined."

No instructions were given for the defendant.

The jury returned a verdict for plaintiff, assessing their actual damage at $700, and the punitive damages at $1,000. A timely motion for rehearing was filed, pending which defendant entered a remittitur of $500, of the punitive damages, whereupon the motion for new trial was overruled. Defendant appealed.

*Martin L. Clardy* and *Henry G. Herbel* for appellant.

(1) The court erred in admitting the evidence offered by plaintiffs regarding the inclemency of the weather. Collier v. Swiney, 16 Mo. 488; Miller v. Railroad, 62 Mo. App. 258; Harrison v. Railroad, 74 Mo. 371; Shelby v. Railroad, 77 Mo. App. 208. (2) The court erred in giving the instructions for plaintiffs. McGee v. Railroad, 71 Mo. App. 314; Owen v. Railroad, 83 Mo. 464; Miller v. Mansfield, 112 Mass. 260. (3) The court erred in refusing the instructions offered by defendant. Same authorities as under point 2. (4) The judgment is excessive. R. S. 1899, sec. 4575; State v. Jungling, 116 Mo. 165; Frantz v. Hilterbrand, 45 Mo. 122; Ross v. Mach. Co., 24 Mo. App. 355; Niemitz v. St. L. Agrl. Co., 5 Mo. App. 61.

*Geo. D. Reynolds* for respondents.

(1) The questions in this case are not, had the railroad company a right, as a common carrier, to ask the payment of a reasonable car-service charge for the detention of its cars beyond forty-eight hours of "free time," and had it a lien on the lumber for those charges, but had it a right, after delivery of the cars to plaintiffs on their private switch, on plaintiffs' premises, for the purpose of enabling the plaintiffs to there unload them to retake the possession of the cars, only partially unloaded, and haul them and the lumber still in them away, because plaintiffs had refused to pay car-service

charges, claimed to accrue after the expiration of the forty-eight hours? The trial court held they had not such right, and instructed the jury on this theory, and the instructions given were right. 3 Kent, Com. (14 Ed.), p. 327; 9 Am. and Eng. Ency. (2 Ed.), p. 221, sec. 1; Ibid, p. 269, par. 7, and notes 1, 2 and 3; Ibid, p. 270-5; Davis v. Wallace, 3 Cliff. (U. S.) 123; Worden v. Bemis, 32 Conn. 268; Birley v. Gladstone, 3 Maule & S. 205. (2) The instructions asked by defendant and refused by the court were not the law; nor were they supported by the issues made by the pleadings. The petition was in ordinary form of trespass, *de bonis asportatis,* and asked for both actual and punitive damages—separately. The answer was a general denial. Under it no facts, or defense, in justification of the trespass, could be admitted—for it was not pleaded. For this reason, also, the bills of lading should have been ruled out and excluded. See cases under point 1, especially, Clifford v. Dam, 81 N. Y. 52; Alford v. Borum, 45 Cal. 482, before cited, and in point on proposition that contract, or license, must be pleaded. (3) The judgment is not excessive. This was a case warranting the giving of punitive damages; they are moderate. 26 Am. and Eng. Ency. (1 Ed.), pp. 622-671, and notes; Arnold v. Sayings Co., 76 Mo. App. 159; Sedg., Damages (5 Ed.), p. 615; Goetz v. Ambs, 27 Mo. 28; 2 Greenleaf, Evid. (10 Ed.), sec. 272; Carter v. Feland, 17 Mo. 383.

BLAND, P. J.—I. Counsel for both parties have devoted a good deal of time to the discussion of the rights of the parties to the possession of the cars after they had been placed in the Darlington yards, and in respect to the right of the defendant to enter upon the switch with its engines to remove the cars without plaintiffs' consent.

The contention of plaintiffs is, that they were in the possession of both the switch and of the cars, and

that the switch was their property and that defendant had no right in or upon it, except by the grace of plaintiffs. To the contrary the defendant contends that it had an interest in the switch, or at least a license to move its engines upon it, and that it never parted with its possession and control of the cars. In the light of the circumstances· surrounding the construction of the switch, it does not seem to us that there should be any serious contention about the rights of the parties in respect thereto. The switch was put in for the profit and convenience of the tenants of the Merchants' and Manufacturers' Railroad Warehouse Company, on its land and mostly at its expense and also for the profit of the defendant railroad company and partly at its expense, so that for the purpose of taking in and pulling out cars consigned to the tenant of the Merchants' and Manufacturers' Railroad Warehouse Company, defendant had a license coupled with an interest in all that part of the switch on the private land of the Merchants' Railroad Warehouse Company, and as such licensee had the unquestionable right to move its engines thereon, to set in or take cars off the track consigned to the lessee of the Merchants' and Manufacturers' Railroad Warehouse Company. Such a privilege can not be arbitrarily or suddenly revoked. Baker v. Railroad, 57 Mo. l. c. 272; Dickson v. Railroad, 67 S. W. 642; Chiles v. Wallace, 83 Mo. 85; Gibson v. St. L. Agricultural & Mechanical Ass'n, 33 Mo. App. (St. L.) 165; McAllister v. Walker, 69 Mo. App. (St. L.) 496; House v. Montgomery, 19 Mo. App. (K. C.) 170; Cook v. Pridgen, Stapler & Dunn, 45 Ga. 331; Kirk v. Hamilton, 102 U. S. 68; Risein v. Brown, 73 Tex. 135; Campbell v. Railroad, 110 Ind. 490; Evansville & Terre Haute R. R. et al. v. Nye, 113 Ind. 223; Garrett v. Bishop, 27 Oregon 349.

The plaintiffs leased the land with the switch upon it and with knowledge of the uses made of it by the defendant, and it was not within their power, as lessees

of part of the land, to revoke the license or to interfere with the use of the switch by the defendant company so long as it did not abuse its license.

2. Plaintiffs claim, and the circuit court so held on the trial, that the plaintiffs were in the possession and had control of the lumber at the time the cars were moved off by defendant. We do not think this claim is exactly correct. The cars were switched on the track in the plaintiffs' yard for the purpose of being unloaded. To accomplish this purpose the plaintiffs were in a sense in possession of both the cars and their contents, but the defendant did not lose its dominion over the cars of lumber so long as it remained in the cars. It retained the right to repossess itself of the cars after they were unloaded and to repossess itself of both cars and the lumber remaining in them for the purpose of enforcing any carriers' lien it may have had on the lumber existing when the cars were placed, or any common-law lien acquired after they were placed in plaintiffs' yard. After the cars were placed plaintiffs had a right to the use of them for a reasonable time for the purpose of unloading. Forty-eight hours, according to defendant's car-service rules, was allowed as a reasonable time in which to unload. The rule further provides that in case the car should be retained by plaintiffs for the purpose of unloading beyond forty-eight hours, plaintiffs should pay as demurrage one dollar per day per car for the time they were detained over the forty-eight hours of free time.

It is conceded that plaintiffs had knowledge of the existence and terms of this rule and that they only objected to the payment of the demurrage charges on account of the weather, and it appears from the evidence of Darlington that the rule had theretofore been recognized and acted upon by the plaintiffs, so that, leaving out of consideration the stipulations in the bills of lading, there is abundant evidence that plaintiffs impliedly agreed to be bound by these car-service rules. But in-

dependent of any express or implied contract of plaintiffs to be bound by the rules, the modern doctrine in this country is that the right to demurrage, in such circumstances, exists independent of contract or statute. Hawgood v. 1310 Tons of Coal, 21 Fed. Rep. 681; Huntly v. Dows, 55 Barb. 310; Miller v. Mansfield, 112 Mass. 260; Miller & Co. v. Georgia R. R. & Banking Co., 88 Ga. 563, s. c., 18 L. R. A. 323; Kentucky Wagon Manufacturing Co. v. O. & M. Railroad, 98 Ky. 152; Owen v. St. L. & S. F. Ry. Co., 83 Mo. 464; McGee v. C., R. I. & P. Ry. Co., 71 Mo. App. (K. C.) 314; Norfolk & W. R. Co. v. Adams, 18 S. E. (Va.) l. c. 675.

In this State demurrage charges, as to shipments of grain in carload lots, are allowed by statute. Section 1115, R. S. 1899.

The right to make the charge, we think, is established by the modern authorities. The Chippewa Falls bill of lading expressly stipulated for a lien for demurrage charges, the Oregon one did not. The question then is, did defendant have a lien on the lumber remaining in the car from Oregon when it moved it? The English rule is that no lien exists for demurrage charges under the maritime law unless it is expressly provided by contract (Burley v. Gladstone, 3 Maul. S. 205), and some of the American courts have followed the English doctrine. Gage v. Morse, 12 Allen 410; Chicago, etc., Ry. Co. v. Jenkins, 103 Ill. l. c. 598; Cleveland, C. C. & St. L. Ry. Co. v. Holden, 73 Ill. App. 582; B. & M. R. R. Co. v. Chicago Lumber Co., 15 Neb. 390; Crommelin v. N. Y. & Harlem R. R. Co., 4 Keys 90.

The authority of the case of Gage v. Moore is overturned by the later Massachusetts case of Miller v. Mansfield, supra. The Nebraska case followed the case of Railroad Co. v. Jenkins, 103 Ill. 598, without comment.

Coming to the recent cases we find the following decisions hold that the right of lien exists independent of

contract: McGee v. Railroad, Miller v. Georgia R. R. & Banking Co., Kentucky Wagon Manufacturing Co. v. O. & M. R. R., Miller v. Mansfield, supra, and 4 Elliott on Railways, sec. 156.

The railroad commissioners of some of the States have recognized the rule and the right to enforce de-murrage charges. The Kansas Commission in the case of Davis v. M., K. & T. Ry. Co., Commissioners' Reports of Kansas, 1891, p. 21, the Iowa Commission in Rothschild v. Railroad, Commissioners' Reports, 1887, p. 783; the Missouri Commission in the case of E. R. Darlington & Co. v. Central Car Ass'n of St. Louis, May 16, 1901.

The following is quoted from the opinion of Judge Toney, chancellor before whom the Kentucky Wagon Manufacturing Company case was first heard as presenting a sound and logical demonstration of the necessity and reasonableness of the rule:

"Without the right of making and enforcing reasonable rules and regulations as to the delivery of freight and the detention of their cars by consignees, railroads would be at the mercy of individual shippers. In order to fulfill the chief end of their creation, viz., the service of the public as common carriers, they should be left free to establish general and reasonable rules and regulations, governing the delivery of freight and charges for the unnecessary or unreasonable detention of their cars by consignees. It is a matter of the highest public interest that they should be accorded this right and power. Individual convenience should be subordinate to the public good, which demands expedition, regularity, uniformity, safety and facility in the movement of the freight of the country which must of necessity be materially obstructed if individual consignees are allowed, without let or hindrance, to convert freight cars on their arrival with cargoes of freight upon their sidetracks, into warehouses for the storage of freight at the suggestion of their convenience or in-

terest.   As we have seen, railroads are a public nec-
essity, the general welfare of the country being de-
pendent upon their untrammeled inter-connection, and
untrammeled liberty to accomplish the legitimate public
purposes of their organization.   Promptness, regular-
ity and safety in the transportation of passengers and
freight are essential requisites to the successful admin-
istration of the railroad common carrier's system of
the country.   These characteristics or qualities, are
demanded by the public interest.   Regularity and
system in the movement of their cars, in the
handling of freight both in receiving, transport-
ing and delivering it, so that the public can
know what to expect and what it can depend
upon, are demanded of railroads by law and by public
policy.   But how can this be expected of railroads if
their rolling stock may be tied up and waterlogged upon
the private sidetracks and switches of private con-
signees to serve as storerooms and warehouses for their
freight, without any power on the part of the railroad
companies to enforce reasonable rules against such
consignees, requiring diligence in the unloading and
redelivery of their cars?   These public carriers rely
upon their rolling stock to meet the demands of the
volume of business which they have to carry.   How
can they insure to consignees and shippers in general
and to the public that facility of commercial interchange
which they are required to afford both by charters and
by public law?   How can they furnish cars and trans-
portation to shippers in general and discharge the vol-
ume of traffic business of their respective systems if
their rolling stock can be locked up in private yards
of special consignees?   How can such carriers know
with any reasonable degree of certainty whether their
rolling stock at any given time is, or will be fully up to
the demands of the business along their lines?   Prompt-
ness, uniformity and safety in the railroad traffic busi-
ness of the country can only be secured by the adoption

and strict enforcement by railroad companies of uniform and reasonable rules and regulations, which shall be binding upon all shippers and consignees alike with reference to the reception, transportation and delivery of freight.

"These qualities in railroad administration, it requires no philosopher to see, are indispensable to the proper accommodation and service of the interests to the public; and it should be the leading principle of action with all railroad managers to adopt and impartially enforce such rules and regulations as will most effectually secure those desired ends for the public." 50 Am. and Eng. Ry. Cases, 90.

It is conceded by the parties that forty-eight hours is a reasonable time in which to unload a car and that one dollar per car per day is a reasonable demurrage charge for their detention after forty-eight hours.

We think the right to make the rule and to enforce it is pretty thoroughly established by the modern American cases and that the defendant had a lien upon the lumber which had not been unloaded from the Oregon car. Barker v. Brown, 138 Mass. 340; Steinman v. Wilkins, 42 Am. Dec. 254; Schmidt v. Blood, 24 Am. Dec. 143.

The bill of lading for the Oregon car expressly provided forty-eight hours only should be allowed for unloading. For the Chippewa Falls car, the time stipulated for unloading was forty-eight hours but the right to remove the car and warehouse the lumber was restricted to seventy-two hours. The bills of lading were contracts not only for the shipment of the lumber, but they prescribed the duties of the plaintiff after they reached their destination. Gashweiler v. Railroad, 83 Mo. 112. Under the contract, the time given plaintiff to unload Chippewa Falls car had not expired when defendant took the lumber away from plaintiffs' yard. The taking of this lumber therefore was unjustifiable.

In respect to the other car the time for unloading had expired and the defendant, under the evidence, had a right to take the lumber into its possession and hold it at the expense of the plaintiffs for the payment of its demurrage charge, unless plaintiffs were excused for non-compliance with its contract to unload in forty-eight hours on account of an extreme condition of the weather. That this excuse is unavailing, we think is well settled by the authorities. Hutchinson states the rule as follows: "If the carrier has agreed to carry the goods to their destination and there deliver them within the prescribed time, he will be held to a strict performance of his contract and no temporary obstruction or even absolute impossibility will be a defense for failure to comply with the agreement." Hutchinson on Carriers, sec. 317.

In Harrison v. Mo. Pac. R. R. Co., 74 Mo. l. c. 371, the Supreme Court, speaking through NORTON, J., said: "Where a party by contract agrees to do a prescribed thing in a prescribed time, he is liable for non-performance of the contract, notwithstanding the fact that his non-fulfillment of the contract was occasioned by inevitable and unavoidable accident." To the same effect is Gelvin v. Railroad, 21 Mo. App. (K. C.) 273; Miller v. Railroad, 62 Mo. App. (K. C.) 252; Waters v. Richmond & Danville Ry. Co., 16 L. R. A. 834; Atkinson v. Ritchie, 10 East 530; Wareham Bank v. Burt, 87 Mass. 113; Nelson v. Odiorne, 45 N. Y. 489; Cutliff v. McAnally, 88 Ala. 507; Cassady & Dunn v. Clarke, 7 Ark. 123; Ward v. The Hudson River Building Co., 125 N. Y. 230.

There are numerous other cases in support of this doctrine. The cases which seemingly announce a contrary doctrine will be found to be cases involving obligations where the thing to be done is one of duty and not of private contract; as in Ballentine v. N. Mo. R. R., 40 Mo. 491, where it was held a carrier was excused for failing to deliver goods in a reasonable time on ac-

count of delays occasioned by an extraordinary snow storm. See also Davis v. Railroad, 89 Mo. 340; Cunningham v. Wabash R. R. Co., 79 Mo. App. (K. C.) 524; Wittemore v. Sills, 76 Mo. App. (K. C.) 248. Also in cases where the contract is on the basis of the continued existence of a given person or thing. In the latter class the condition is implied that if the performance becomes impossible on account of the sickness or of the perishing of the person or thing, the performance will be excused, as in Walker v. Tucker, 70 Ill. 527, where the exhaustion of a coal mine was held to excuse further performance of a contract or lease; as in Hall v. School District, 24 Mo. App. (K. C.) 213, where the burning of the schoolhouse was held to relieve the school district from its contract of employing the teacher; as in Wolffe v. Howes, 20 N. Y. 197, where sickness of the person employed was held to relieve him from a performance of his contract of employment; as in Lord v. Wheeler, 67 Mass. 282, where the contract was to repair a house and the house was destroyed by fire; as in Butterfield v. Byron, 12 L. R. A. 572, where a contract to furnish part only of the labor and material for the erection of a building was held as discharged on the destruction of the building by fire before it was completed, and as in Dexter v. Norton, 47 N. Y. 62, where it was held that the destruction of personal property before title had passed, after the contract for the sale of the property, relieved the vendor from liability for failure to deliver.

Our conclusion is, that, under the pleadings and the evidence, the defendant was not guilty of trespass; that it had a right to take possession of the car shipped from Oregon and to store the lumber remaining in the car until its demurrage charges were paid, but that it had no right to take the car and lumber therein shipped from Chippewa Falls, the time agreed upon in which it might be removed not having expired, and that its taking and retention of the lumber was a conversion thereof to its

own use and that plaintiffs, having paid the freight, are entitled to recover the market value of that lumber at St. Louis on the day it was taken by the defendant.

The judgment is reversed and the cause remanded. *Barclay* and *Goode, JJ.,* concur; the former concurs in the result.