JAMES A. FREED, APPELLANT, v. IVORY A. GREATHOUSE ET AL., RESPONDENTS.—181 S. W. (2d) 41.

Kansas City Court of Appeals. May 8, 1944.

*Joe Levin* and *Chas. N. Sadler* for appellant.

*Guy W. Rice* and *W. Raleigh Gough* for respondents.

472

CAVE, J.—This is an action seeking an injunction to compel defendants to remove obstructions from a strip of land fifteen feet wide and approximately sixty feet long in which plaintiff claims an easement by prescription. Trial before the Circuit Court of Jackson County, resulting in a judgment for defendants, and plaintiff appeals.

Plaintiff alleged that he was engaged in the cleaning business located at 3107 Main Street, Kansas City; "that he is the owner of an easement by prescription for the use of automobiles, pedestrians and wagons in connection with his said business over said strip of ground. . . ." Then follows the description of the land. That defendants had constructed a fence and other obstructions across the east end, thereby preventing plaintiff from using the same and praying for an order requiring the defendants to remove said obstruction and enjoin them from interfering with the use of said easement. The answer was a general denial. No question is raised as to the sufficiency of the petition. We will treat it as pleading a good cause of action.

Plaintiff is a tenant in a building located at 3107 Main Street in Kansas City. It faces west on Main Street and extends eastward to an alley. The owner of this property is not shown in the record. The defendants are the owners of the lot and building thereon immediately adjacent to and south of the property leased by plaintiff. It is numbered 3109 Main Street. For brevity, we will refer to the property leased by plaintiff as 3107 and the property owned by defendants as 3109.

The building at 3109 does not extend eastward to the alley. There is a vacant space in the rear about forty-eight feet wide and 60 feet

long. Plaintiff claims an easement over the fifteen feet immediately adjacent to the south side of the building he occupies.

He testified that in December, 1921, he was president of the Faultless Cleaners, Inc., a corporation, and, as such, leased the building at 3107 Main Street for a period of five years. Since that time the occupancy has been on a month to month rental basis. In 1926 the corporation was dissolved and its assets sold to the Criterion Clearners, a corporation, of which he was vice-president for a time. In March, 1929, plaintiff and a man by the name of Bertram formed a partnership and took over possession of this building and continued to occupy it as a partnership until 1941, when Bertram died and plaintiff purchased his interest from the administrator, and has occupied the premises as an individual since.

. His testimony concerning the arrangement made for trucks and vehicles to drive from the alley onto the vacant portion of the lot is indefinite and unsatisfactory. It seems that vehicles could not be parked on Main Street immediately in front of the building because there was a safety zone in the street for passengers using street cars, thus leaving insufficient space for parking. The alley at the rear of the buildings was about fifteen feet wide and parking there would obstruct other traffic.

At the inception of this matter in 1921 there appears to have been an old garage, a "shack" and other material located on the vacant part of this lot. Sometime after 1921, and as best we can surmise from the record, it was about 1926 plaintiff had a conversation with a Mr. George Main who, plaintiff thought, owned the property which is now owned by the defendants. That Mr. Main told him they were going to tear down the old shack "and that is when we spoke of wrecking the old building and building a rock wall around the stairway to the basement there and building a dock. He said he had lumber, and he would furnish it, and would take the lumber out of the old garage and use it on the dock and we would build this wall, which I did myself, and I paid for it all myself, and set pieces of lumber which we used in the dock; that we had it filled up with ashes so we could drive in there. Q. Did you and Mr. Main—you helped Mr. Main tear down this building? A. Yes, sir." This occurred in the fore part of 1926, and the dock was built in 1927. "Q. And after that was done did you drive or back in there? A. That was the agreement with Mr. Main, that I talked over with him before we ever started working on it. Q. That you would both use the space in there? A. Yes, sir." On cross-examination plaintiff testified: "Q. Now, you say that Mr. Main said it was all right for you to go in there and park? A. Yes, sir. Q. What else did Mr. Main tell you? A. He said he would tear the old building down, build a dock where the hole was, and build a stone wall around there, and that he had plenty of lumber out of the garage. Q. What did he tell you about using

it? A. That we could use it for loading and unloading, and parking. Q. Did you have any agreement with him as to how much he would let you have? A. No." He further testified that he had repaired the dock two or three times during the years, and all told, had spent from $400 to $500 in building the dock, retaining wall and for repairs. Later he gave this testimony: "Q. When was that loading dock built? A. The first time it was built about 1926. Q. Did you build it then? A. Mr. Main built it—and employees of his. Q. Who furnished the material that time? A. Mr. Main furnished the material that time." After George Main died (the record does not show when) plaintiff had a conversation with D. C. Main, who was administrator of the estate of George Main, in which D. C. Main told the plaintiff "that we would get along all right, no use bothering with anything, and get along like that, and possibly all use it together then, but he would not use the lot so much, neither would I, and we would all use it."

After the old building was torn down and the space cleared of debris, plaintiff and his employees used it for parking purposes and for loading and unloading supplies for his place of business. Occupants of the property which the defendants now own did the same, and people coming on business would also park there. The space would accommodate twenty-five or thirty vehicles.

Defendants' evidence shows that the Ward Investment Company, a corporation, owned the property now in controversy from 1924 to 1940, at which time it was conveyed to Helen Beals and Robert Ward, and in July, 1941, they conveyed it to the defendants. That during all of that time the corporation had no information that the plaintiff was claiming an easement in this property although it was known that people parked their automobiles on the vacant space. That the corporation did all of the repair work on the dock except on one occasion when plaintiff's truck backed into it and did some damage and he was required to repair that.

Before the defendants purchased this property Mr. Greathouse had a conversation with the plaintiff concerning his right to use the vacant lot. They do not agree as to the details of the conversation. Plaintiff's version is that Greathouse asked him if he had any lease on this property, and he said no; and that if Greathouse decided to put a building on the vacant property, could the plaintiff run his vents to the ceiling on his own property, which plaintiff agreed he would do; that Greathouse said plaintiff should pay rent for the use of the vacant space and "to avoid an argument I will pay $25 or $30 a year." Greathouse testified that when he asked plaintiff by whose authority he was using the space, "he said he had no one's permission, other than the people who were neighbors there and permitted him to do so over a period of years, but that he claimed no right whatever to the property.

. . ." He suggested that he would be willing to pay a small rental for it.

This case being in equity, it is heard here *de novo* on appeal and the weight of the evidence is properly passed upon by this court. However, we will usually defer to the findings of the chancellor, especially where there is conflicting verbal testimony involving credibility of witnesses who appeared before him, except when convinced that his findings are against the weight of the evidence. [Shaw et al. v. Butler, 78 S. W. (2d) 420.]

The question first to be determined is whether the use was really *adverse* to the owner, or was it merely permissive in its character? "If permissive in its inception, then such permissive character being stamped on the use at the outset will continue of the same nature, and no adverse user can arise until a distinct and positive assertion of a right hostile to the owner, and brought home to him, can transform a subordinate and friendly holding into one of an opposite nature." [Pitzman v. Boyce, 111 Mo. 387, l. c. 392; Fassold et al. v. Shamburg et al., 350 Mo. 464.] "Long-continued user is not sufficient in and of itself to establish an easement. . . . To make the enjoyment of an easement adverse to the owner, . . . the *intent* must exist to claim and enjoy the right adversely. In the absence of such intent and such claim, no adverse enjoyment will arise. [Pitzman v. Boyce, l. c. 393, *supra*; Anthony v. Building Co., 188 Mo. 704.] ". . . merely permissive use of land cannot ripen into an easement," [Seested v. Applegate, 26 S. W. (2d) 796, 799.]

With these rules in mind, we examine the record. Our conclusion is that the great weight of the evidence favors and supports a finding that plaintiff's use was always permissive. Whatever arrangement he first made for the use was with a man named George Main. He didn't know whether Main was the owner or a tenant. From other evidence in the record it is shown that Main was a tenant. After George Main died his Administrator, D. C. Main, took over the business and permitted plaintiff to use the space as above detailed. In 1933 or 34, a man named Greenlee became tenant of the building and plaintiff discussed the user with him and agreed "That he would use the part over from the steps on the north, so he could get in and out of there, on the furniture side. Q. Did he say how long you could use it? A. No; the question was not brought up how long. Q. You knew he was renting the building and back lot? A. Yes, sir."

It is uncontradicted that from 1924 to 1940 the property was owned by the Ward Investment Company, and that it made no agreement or arrangement with plaintiff for the use of the lot and had no knowledge he was claiming any right to use it.

To permit plaintiff to establish an easement on the property under the loose evidence in the record would subject every owner of a vacant lot to the danger of having his property subjected to rights of which

he had never heard. There can be but one logical conclusion and that is, the plaintiff and the tenants of defendants' property agreed to clear away the rubble and use the vacant space for their convenience with no thought of a claim of an easement.

There is no need to discuss other reasons assigned for sustaining the judgment. It follows the judgment should be affirmed. It is so ordered. *Bland, J.,* concurs.

### ON MOTION FOR REHEARING.

CAVE, J.—In his motion for rehearing plaintiff asserts that one J. T. Greenlee had a lease on the property involved, either from the defendant or his predecessor in title, and that because of such lease the defendant had no right to interfere with the use of the property by Greenlee or anyone Greenlee saw fit to permit to use it. No such issue is properly raised by the pleadings. We did not discuss or decide what rights, if any, Greenlee had to the use of the property because such question is not germane to the issues pled and tried in the instant case.

Other questions raised in the motion are without merit. The motion for rehearing is overruled. *Bland, P. J.,* concurs; *Dew, J.,* not sitting.