Mary Blanche GIBSON, Plaintiff-Appellant,

v.

Ella May SHARP, Lalla Adams, Gladys Phillips, Gladys Sharp, Bonnie F. Sharp, James Sharp, Dorothy B. Sharp Gaither and Hazel Norma Sharp Townsend, Defendants-Respondents.

No. 7393.

Springfield Court of Appeals.

Missouri.

April 8, 1955.

Jones & Jones, Kennett, for plaintiff-appellant.

Ward & Reeves, Caruthersville, for defendants-respondents.

RUARK, Judge.

The case is here by transfer from the Supreme Court. 270 S.W.2d 721.

Plaintiff's petition (filed June 1, 1951), after stating ownership and privity in title, alleged that the owners of adjoining lands agreed to the digging of a drainage ditch having for its purpose the benefit of both parties, about 1912, the digging and maintenance of the ditch thereafter and the use of such by both parties until the year 1951, when defendants barred plaintiff therefrom by construction of an earthen dam at the boundary line between the parties. Prayer is for mandatory injunction. The trial court denied the relief prayed for.

The substantive question is whether plaintiff-appellant has a right of drainage along and through a ditch which crosses the land of defendants-respondents.

Plaintiff is the owner of the North Half of the Northwest Quarter, Section 23, Township 17, Range 11, Pemiscot County. The east forty acres of this eighty was formerly owned by A. H. Wright, who died in 1942. Plaintiff purchased from his heirs in 1944. This east forty will be referred to as the *Wright land*. Lying along the north boundary of plaintiff's land is another eighty-acre farm owned by the defendants, which is described as the South Half of the Northwest Quarter, Section 14, Township 17, Range 11. Defendants are the heirs or devisees of W. M. (Preacher) Duncan, who died in 1941. It is the east forty of this land, directly north of the Wright forty, which is said to be burdened by a drainage ditch easement. We will refer to this forty as the *Duncan land*. Lying immediately north of the Duncan land is a tract which we will call the *Coleman land*. Running through the Coleman land in a general east-west direction is Pemiscot bayou. At the point with which we are here concerned this bayou runs close to the north line of the Duncan land, leaving an intervening strip of Coleman land not exceeding seventy-five yards in width. All of the land involved is low and, in general, level, although it, particularly the northeast portion of the Duncan land, contains what are referred to by the witnesses as ridges. These appear to be low swells of the character formed by sediment-bearing water and are not to be confused with the high, rocky, "hog back" ridges found in some other portions of our state. The drainage slope in the immediate vicinity is slight, but such as there is is to the northward toward Pemiscot bayou. Thus, standing on the Wright forty and facing north and slightly "downslope" with the drainage, one looks from it across the Duncan forty to the Coleman tract, where Pemiscot bayou runs its crooked way.

At some time between 1912 and 1914 plaintiff's east forty was occupied and farmed by plaintiff's predecessor in title, Wright. All of it was in cultivation except a small tract near the north boundary which was lowland, in thicket and used as a pasture. At that time the east forty of the Duncan land to the north was in woods except some nine to fifteen acres on the east side cleared and in cotton. Duncan did not live on the tract and cultivation of this portion was by tenant. Extending through the approximate center of the Duncan tract was a swale or a swag, not in any sense a ravine or gully but a depression or series of depressions which were lower than the land on the east and west and where, at least in wet weather, water collected and stood in the woods. This series of depressions, sometimes referred to as sloughs, extended some distance into the Wright forty which adjoined on the south. As water accumulated in rainy seasons on the Wright land and the higher portions of the Duncan land it gradually worked its way to the north down the swale toward Pemiscot bayou; so also in extremely wet weather and when the water in the bayou was high did it creep back up through the sloughs and spread over the lower lands. The Wright land, even at this time, had some laterals or ditches which drained into the swale on its south side of the boundary line. While the evidence is not entirely clear as to this point, it would appear that there were also some lateral ditches on the Duncan land.

According to plaintiff's evidence, about the year 1912 Wright and his sons, by agreement with Duncan, cut what is called

the *spade ditch*. This ditch commenced on the boundary line between the Duncan and Wright forties at about the center and and thence meandered northward with the swale through the woods following the depressions, skirting where possible the ends of minor swells, to the north line of the Duncan land. From there the water drained off into the bayou through a "dip" on the Coleman land. This spade ditch was not continuous but was only a connecting of low spots in the swale and a cutting through of the "ridges" where necessary. It was to some extent experimental, to find where the water "wanted to go." Most of the work was done by Wright and his sons, but Duncan was present from time to time during the progress of the work and helped occasionally. Within two years afterward the Wright family, this time with the assistance of some extra help, went in with teams and scrapers and, following approximately the meanderings of the drainage which had been established by the spade ditch, made a continuous ditch approximately six feet wide at the top and four feet at the bottom. The depth varied as necessity required according to topography. This is called the *scraper ditch*. The construction was by agreement with Duncan, who, prior to commencement, walked over the land with Wright and was present and occasionally assisted by taking an ax and chopping roots out of the way. The principal labor and expense were furnished by Mr. Wright and the time spent in this construction was approximately two weeks.

Both lands received the benefit of this ditch, which assisted nature in getting the water off more quickly and along a more narrow course. Mr. Duncan had sloughs on his land to be drained and a smaller ditch was dug to make lateral drainage. Thereafter Duncan gradually had cleared and put in cultivation more of his forty and the drainage from this cultivated land went into the scraper ditch. By 1932 all of his forty was in cultivation except a woods lot which followed the drain through the approximate center of his tract. Between 1932 and 1936 he completed the removal of all his timber. According to plaintiff's evidence Wright

and his sons cleaned out the ditch every spring and kept it open for flowage until approximately 1934, and occasionally Mr. Duncan or his tenant assisted in the cleaning operation. The boundary line between the two forties was first used by the parties as a turnrow and as a private lane. Persons farming the Duncan land, as well as the Wright family and also the Gibson family, who owned the forty west of what we call the Wright land, used it as a matter of convenience. About 1922 a wooden culvert with a six-to eight-foot floor was built over and across the ditch or depression where it crossed the Wright-Duncan boundary line. This culvert was replaced as it rotted out or deteriorated on two different occasions. The first culvert was built by the Wrights with the assistance of Duncan, the second by Duncan's tenant with the assistance of the Wrights, and the third by the Wrights with the assistance of Duncan's tenant. Up to this point the evidence is in hopeless conflict, for the defendants and their witnesses deny the very existence of the spade and scraper ditches.

The years of the early 30's appear to have been a period of sparse rainfall, drainage was no problem and the ditch was not needed. For a period extending from 1932 (?)–1934(?) to 1937 the ditch was not maintained by anyone and became filled in at least to some extent, and apparently the culvert passed into oblivion. During this period Mr. Duncan was engaged in taking the timber off the last of his woods lot and placing the remainder of his forty in cultivation. His tenants "dragged implements" across the bed of the old ditch and, in places at least, plowed across it. Thus the ditch as a separate and clearly distinguishable entity was practically eliminated and there remained only the general contour of a "swag" twisting through the land. At some time, period not shown, it appears that the small laterals on the Wright land had also been plowed over. About 1937 the rainfall was again considerable and both tracts and crops thereon suffered from standing water. According to plaintiff's evidence, Duncan and one Howell, who was then his tenant, came and talked to Wright and they went down to look the situation

over; Duncan said the ditch was going to have to put back and inasmuch as his tenants had been responsible for the dirt filling in he would put it back; Wright and his sons agreed that, if this should be done, when the first rain came they would go in and "knock out the high places so it would have a natural drain." Under that alleged arrangement Duncan got a grader and Caterpillar and built a ditch along the old scraper ditch line which was wider but not quite as deep as the previous ditch. This is the last ditch and we will call it the *grader ditch.* Such ditch ran to the north line of the Duncan tract. The dip on the Coleman land had filled in and Duncan gave one of the Wright boys $12 to dig the ditch on to the bayou. As to where the new ditch extended on the south there is a sharp dispute of facts. One McCloskey, who dug the grader ditch for Duncan, and other witnesses testified that it commenced, as directed by Duncan, at a pot hole some twenty-five feet to fifty steps north of the boundary line between the forties; whereas plaintiff's evidence was that it followed the course of the old scraper ditch to the forty line. McCloskey and other witnesses for defendants also testified that immediately prior to the digging of the grader ditch in 1937 the land by its appearance did not show the existence of the previous scraper ditch. As to the apparent existence or non-existence of the old scraper ditch in 1937, the testimony of witnesses on both sides could well be true. The scraper ditch had not been maintained since 1934 at the latest. The years were dry and the soil was apparently of the friable type. Duncan had been clearing off and taking out the timber along its course and the ditch had been crossed by tenants and had been neglected as heretofore stated. The water of 1937 had stood over it and flowed above and along it. Just when a ditch becomes a swag is a matter of individual opinion, depending sometimes upon the willingness of the beholder to see, or the reluctance of the seer to behold. If plaintiff's privy had a right of way at that time it had been acquired long before 1932. (No contention has been raised as to the possibility of lapse by reason of default of contract or condition in reference to maintenance.)

Plaintiff's evidence was that after the 1937 grader ditch was dug Wright and son cleaned it out two or three times and that Howell (Duncan's tenant) "crumbed it out." Defendants' witnesses, on the other hand, deny that the Wrights ever contributed to the maintenance of the grader ditch either in labor or in expenditure of funds.

The first seed of dissention sprouted sometime after the plaintiff purchased the land from the Wright heirs in the year 1944. At that time the Duncan land was rented to one Henry Howell (now deceased), and Howell went to Mrs. Sharp, who was managing the land for the Duncan heirs, and begged her to "stop them from ditching water over on his land." She testified, "I told him that unless I was actually working the crop it was better for him and Gibson to settle their questions, but if I ever worked the crop and they did me that way, I would take the matter up personally with them." This witness testified that her land was not bothered by natural drainage from the Wright land, that the water didn't drain that way; "if it is helped across it fills up my lowland and drowns me out"; that her trouble was that every year Gibson "ditched over on me, that is where the water bothered us." In 1949 the tenant on the Duncan forty threw some dirt in the ditch opening. Plaintiff's husband took a shovel and threw it out.

Commencing in the summer or fall of 1950 defendants employed a grader and commenced to fill in the low places on their land and dragged dirt toward and built up the space along the old turnrow. Appellant's counsel insist that this raised place along the boundary line should be called a dam, whereas respondents' counsel contend we should term it a road. Resisting any frivolous combination of the words, we will refer to it as a raised-way. This raised-way followed the old private road substantially from the east side across and along the entire boundary line between the two forties and extended west a further dis-

tance of approximately half a quarter. By the dragging in of dirt it was raised in some places approximately knee-high to two and a half feet, and as it extended across the land it filled in and dammed up the ditch, depression, dip, or whatever the terminology, at the old culvert site which had previously served as the way for drainage from the Wright forty. Thus it effectively constituted an embankment to back surface water over portions of the Wright land, and there was evidence of substantial damage occasioned by the standing of such water. On three different occasions the plaintiff cut into the embankment and inserted a twenty-four-inch metal tile. On each occasion the defendants had the tile taken out and the space filled in. On the last occasion such was done in the presence of the sheriff, and this lawsuit is the result.

■ Excluding for the moment the opening where the culverts formerly existed, the defendants had the right to build and maintain the raised-way which extended along the length of the boundary line. Missouri follows the "common enemy" doctrine, and with certain exceptions not here involved a landowner may dam against surface water even though in so doing he casts it back upon his neighbor. City of Hardin v. Norborne Land Drainage Dist., 360 Mo. 1112, 232 S.W.2d 921; Goll v. Chicago & A. R. Co., 271 Mo. 655, 197 S.W. 244; 12 A.L.R. 2d at page 1341. However, he may not gather it and discharge it at one place to the injury of an adjoining owner. Kiger v. Sanko, Mo.App., 1 S.W.2d 218; Casanover v. Villanova Realty Co., Mo.App., 209 S.W. 2d 556.

The appellant submits her right to burden respondents' land upon two grounds, i. e., (1) an equitable estoppel and (2) a prescriptive right acquired through adverse possession.

■■ A bare license may be revoked at any time. But in order to avoid an otherwise harsh working of the law the courts of equity applied an equitable estoppel to a situation where the licensee had made material expenditure of money or labor to secure the enjoyment of his use. House v. Montgomery, 19 Mo.App. 170. This doctrine was thereafter limited to situations where there was a prior or concurrent agreement with consideration, Pitzman v. Boyce, 111 Mo. 387, 398, 19 S.W. 1104, and applied where the licensee was said to have become a purchaser, Cape Girardeau, etc. v. St. Louis, etc., Railway Co., 222 Mo. 461, 484, 121 S.W. 300; Grandstaff v. Bland, 166 Mo.App. 41, 148 S.W. 139, or had acquired a power coupled with an interest, Darlington v. Missouri Pac. R. Co., 99 Mo.App. 1, 12, 72 S.W. 122; Lewis v. Kaplan, Mo.App., 300 S.W. 1041, 1043; Baker v. Chicago, R. I. & P. R. Co., 57 Mo. 265. The principle was rejected in toto by Mine La Motte Lead & Smelting Co. v. White, 106 Mo.App. 222, 80 S.W. 356. But in the leading case of Sanford v. Kearn, 223 Mo. 616, loc. cit. 629, 122 S.W. 1051, loc. cit. 1056, the doctrine as originally stated was approved. The language of the court is, "A license to use a way or an easement, though without consideration at its inception, may not be revoked at will where, from the very nature of the license, the licensee was expected to go to great expense in order to enjoy it, and where that expense has been incurred. In such case equitable estoppel arises and the relations of the parties may not be severed and the easement destroyed at the whim and by the act of the licensor alone. They must be severed, if at all, on equitable principles." This was reaffirmed in Oliver v. Wilhite, 227 Mo.App. 538, 55 S.W.2d 491, 493. Thus the limitation upon the power to terminate licenses under the doctrine of estoppel is not dependent upon the manner of creation of the license. To this extent the doctrine is inconsistent with that applicable to the creation of easements. 5 Restatement, Licenses, sec. 519, p. 3138.

■■ One in possession under a bare license or permissive use cannot, under such use, acquire a prescriptive easement. Williams v. Diederich, 359 Mo. 683, 223 S.W. 2d 402; Riebold v. Smith, Mo.App., 150 S. W.2d 599; Daudt v. Steiert, Mo., 205 S.W. 222. To become of prescriptive character there must be a distinct and positive assertion of right hostile to the permissive use, notice of which must be brought home to

the owner, before it can become adverse. Fassold v. Schamburg, 350 Mo. 464, 166 S. W.2d 571; Freed v. Greathouse, 238 Mo. App. 470, 181 S.W.2d 41. And one who seeks to burden the land of his neighbor by an easement which has its origin in parol has the burden of proving every element of his case by clear and positive evidence. Burnett v. Sladek, Mo.App., 251 S.W.2d 397, 399; Horton v. Gentry, 357 Mo. 694, 210 S.W.2d 72, 75.

The method by which easements can be acquired by prescription is analogous to acquisition of title to land by adverse possession. Jaeger v. Reynolds, Mo., 276 S.W.2d 182; George v. Crosno, Mo.App., 254 S.W.2d 30, 34; Zinser v. Lucks, 361 Mo. 671, 235 S.W.2d 844. It has been held that the essential facts necessary to be proved in order to establish a prescriptive easement are, first, user for more than ten years; second, that the user was adverse; third, that it was under claim of right; fourth, notice to the owner of the user and of its character and of the claim of right. Roberts v. Quisenberry, 362 Mo. 404, 242 S. W.2d 26, 28; Robbins v. Anderson, Mo. App., 274 S.W.2d 809. The user must be blessed by a claim of right at the outset and not a hope it will ripen into one in the future. Riebold v. Smith, supra; see Power v. Dean, 112 Mo.App. 288, 86 S.W. 1100. It is adverse when it is not in subordination to the owner, when the claimant *intends* to hold it as such in non-recognition of the right to terminate such use in those against whom it is claimed, and when it is open and notorious. Sanford v. Kern, supra; Jacobs v. Brewster, 354 Mo. 729, 190 S.W. 2d 894; see Pahler v. Schoenhals, Mo., 234 S.W.2d 581, loc. cit. 582. But it need not have been exclusive in the sense that the ditch would serve only the claimant, Majors v. Bush, 356 Mo. 17, 200 S.W.2d 892; 27 A.L.R.2d at page 337; or continuous, except there be no break in the essential attitude of mind required for the adverse use, 5 Restatement, Property, sec. 459, comment, p. 2936; if the use was the best the subject matter was susceptible of. Sanford v. Kern, supra, 223 Mo. loc. cit. 628, 122 S.W. 1051.

Returning to the evidence, we recognize the rule of deference, but the case is here de novo and the ultimate responsibility to determine the weight of the evidence and apply the law is ours. As stated, defendants' witnesses deny the existence of the spade and scraper ditches, and this necessarily carries with it a denial of the agreement and of the construction and maintenance by the Wrights. There were too many witnesses and the evidence is too voluminous to be set forth in detail, but we are satisfied that the weight of the evidence is that the ditches were so constructed, that this was by agreement, that the principal portion of the work of such construction was furnished by Wright and his family, that drainage was carried by the ditch after it was so constructed, that it was a benefit to the Wright land and was a benefit to the Duncan land in that it drained his land from both sides and was of value in enabling him to continue the clearing and to cultivate his land. While defendants produced witnesses who denied the existence of the ditches, considerable of such testimony was negative in the sense that some of them never *saw* the ditch there and never *saw* its maintenance. On the other hand, a number of plaintiff's witnesses detail various incidents concerned with the old ditch. Several of them played up and down it in childhood. Richard and Cecil Wright, sons of the original owner, testified, and their sister to some extent supported them, as to the circumstances and incidents of the original construction and the agreement in respect to such construction and maintenance and the participation therein by Mr. Duncan. As to the Wright brothers, respondents suggest that they were uneducated and that we are justified in concluding they were in their dotage. An examination of the record indicates they were fifty-three and forty-eight years old, the identical ages of two of the brethren of this court. We declare here and now that we will not judicially presume that men of such ages are *necessarily* senile. Their testimony, and that of others who supported them, details incidents which we believe not likely to have been concocted out of the thin air even in the fertile brain of youth. If there

is no proof of a mere license and no conclusive proof of easement, whether the use was prescriptive in character or permissive only is a fact to be found and inferred from the circumstances. Jacobs v. Brewster, 190 S. W.2d loc. cit. 897. The only fair inference to be drawn is that the ditch was to be permanent, at least for so long as necessary or useful in draining the lands. Respondents have been using it, or its replacement in being, for the benefit of their land. It was constructed under an agreement having a consideration and for mutual benefit. A claim of right by Wright under such agreement was consistent with such fact. An attitude of mind which held the use as permissive only would be inconsistent. To so construe it would be to say that the parties considered that at the mere whim of Duncan he could dam off the ditch and thereby Wright could lose not only the effort and expense he had put into the ditches, but, in this instance, continuance of the natural drainage as it had existed prior to their construction. There being such agreement, Duncan was necessarily charged with notice of Wright's claim of right thereunder. His acceptance of the benefits, his participation in the construction and maintenance and his restoration of it were acts of recognition.

Respondents have cited us Daudt v. Steiert, 205 S.W. 222, and Kuhlman v. Stewart, 282 Mo. 108, 221 S.W. 31. In the Daudt case the evidence in regard to an agreement consisted of fragmentary statements alleged to have been made by the deceased, which statements made no immediate reference to an agreement. It was said, 205 S.W. loc. cit. 225, it was impossible to determine whether there was a permissive use of the Runge land, as it served no purpose to such land, or whether it was intended to form the basis of a right. The Kuhlman case involved two ditches. It was said, 282 Mo. loc. cit. 116, 221 S.W. 31, as to one that proof of parol agreement destroys the presumption of a grant. But, as stated in Jacobs v. Brewster, supra, we have now outgrown the fiction of a supposed grant. As to the other ditch, sufficient time had not elapsed to permit the maturing of a prescriptive right.

The right had been acquired prior to 1930. During a period of from three to six years the weather was dry and the ditch was not needed. No work was done on it and it was plowed over. Whether this action, or non-action, amounted to an abandonment has not been seriously presented (no doubt because respondents contend nothing existed which could be abandoned). An abandonment involves not only the act, that is, the nonuser, but also the intention to abandon, and such intention may be inferred only from strong and convincing evidence. In the recent case of Hennick v. Kansas City Southern Railway Co., Mo., 269 S.W.2d 646, it was held that such intention could not be found from an express written application to the Public Service Commission for permission to abandon the operation which expressed the use. Here the cessation of use was during a time when the instrument, i. e., the ditch, was not necessary as a vehicle to carry nonexistent flowage. When the rains came again the use was resumed and thereafter continued as before until the outbreak of the present controversy.

Whether we look at the facts from the viewpoint of an equitable estoppel, or as establishing an easement by prescription, or simply as a contract which has been performed, 28 C.J.S., Drains, § 52, p. 394, we believe, and we so hold, that respondents were without right at this late date to dam off or obstruct the surface drainage from appellant's land through the opening and down the ditch described in the pleadings and the evidence and at the location and of the dimensions herein referred to, and that they should remove any obstructions by them placed therein. However, by plaintiff's evidence the agreement was that the owners of the Wright land were charged with the responsibility of maintaining the ditch. They were not required to do a useless thing, that is, to maintain it when such maintenance was not necessary or when someone else had gratuitously performed the work, but we think the duty to maintain it (in such manner and at such times as to do least injury to the land through which it runs and the crops thereon) is a

condition to the continued enjoyment of the use.

The case will be reversed and remanded with direction to enter judgment in accordance with the views herein expressed.

McDOWELL, P. J., and STONE, J., concur.